(94 South. 424)

No. 23757.

## GONSOULIN v. EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

(Nov. 27, 1922.)

*(Syllabus by Editorial Staff.)*

**1. Insurance ⬳130(2)—Under premium receipt insurance held not effective when risk not acceptable on plan and the premium applied for.**

Where premium receipt provided insurance should be effective from its date provided the applicant was on that date, in the opinion of the insurer's authorized officers, an insurable risk, and the application was otherwise acceptable on the plan, for the amount ·and at the rate of premium applied for, and for substantial reasons the risk prior to the applicant's death had not been found so acceptable, the insurance did not become effective, though the company would have given a policy at a con-·siderably increased premium.

**2. Insurance ⬳141(1)—Insurer not estopped by unauthorized representation of local agent that policy had been issued.**

Where an insurance company's local agent had only limited authority, and had no power to bind it in respect to the issuance of the policy, it could not be estopped to deny that it 'had accepted the application by his representation that the policy had been issued.

152 LA.—28

**3. Insurance ⬳141(1)—Representation held not to estop insurer to deny acceptance of application when applicant could not then have obtained insurance elsewhere.**

Representation by insurance company's agent that policy had been issued did not estop the company to deny that it accepted the application, where, if the applicant or the beneficiary saw the letter containing the representation before the applicant's death, it was after an attack of appendicitis which prevented him from obtaining insurance elsewhere.

**4. Insurance ⬳130(4)—Delay in passing on application held not to estop insurer to deny consent to issuance of policy.**

Whatever relief, if any, may be afforded a proposed beneficiary for delay in passing on an application for insurance, such delay cannot estop the insurer from denying that it consented to issue the policy where premium receipt provided for return of premium unless the· applicant should be found an insurable risk, and the application should be otherwise acceptable as made.

**5. Estoppel ⬳52—Not enforced when against good conscience.**

Estoppel will not be enforced when it is against good conscience to enforce it.

**6. Insurance ⬳130(4)—To treat insurer estopped to deny acceptance of application held contrary to good conscience when applicant not insurable.**

Where premium receipt provided insurance should take effect as of its date if the applicant in the opinion of the insurer's authorized officers was an insurable risk on that date, and the application was otherwise acceptable, and the applicant was not an insurable risk on that day on the plan and at the rate proposed, if at all, it would be contrary to good conscience to hold the insurer estopped by its delay in passing on the application to deny its consent to issue the policy.

Appeal from Nineteenth Judicial District Court, Parish of Iberia; James Simon, Judge.

Action by Mrs. Lydia Gonsoulin, widow of John Walet, against the Equitable Life Assurance Society of the United States. From a judgment for plaintiff, defendant appeals. Judgment annulled and set aside, and judgment granted rejecting plaintiff's demand.

Farrar, Goldberg & Dufour, of New Orleans, and Burke & Smith, of New Iberia, for appellant.

E. S. Broussard, of New Iberia, for appellee.

By the WHOLE COURT.

OVERTON, J. John D. Walet, who was the husband of plaintiff, was desirous of procuring additional insurance on his life. The agents of defendant, learning of his desire, requested him not to act in the matter until they could see him, discuss the matter with him, and show him the forms of policies issued by the defendant, and point out the advantages to be secured by obtaining one of those policies. After the interview, Walet consented to let defendant insure him in the sum of $10,000, payable to his wife, Mrs. Lydia Gonsoulin, the plaintiff herein. He then, on July 6, 1917, made formal application to defendant for the insurance, but with the consent of the agents, if not upon their suggestion, brought about possibly by the delay attendant upon seeing him, dated the application June 26, 1917, so as to enable him to insure as of the age of 42. On the same day Walet was examined by a local physician of good repute, who, however, was not the regular examining physician for defendant in the locality in which Walet resided. After the examination, which was not, as will hereafter appear, in every respect complete, defendant, through its agents, accepted, upon condition, the promissory note of Walet, which was regarded as the equivalent of cash, and issued to him, through its associate general agent, the following receipt, which shows the condition upon which the first premium, evidenced by the note, was accepted, to wit:

"Received of Mr. John D. Walet, No. A–628916, three hundred and fifty-three and 90/100 dollars, the first annual premium on proposed insurance of $—— on the life of John D. Walet, for which the above application is this day made to the Equitable Life Assurance Society of the United States. Insurance subject to the terms and conditions of the policy contract shall take effect as of date of this receipt, provided the applicant is on this date, in the opinion of the society's authorized officers in New York, an insurable risk under its rules, and the application is otherwise acceptable on the plan and for the amount and at the rate of premium applied for; otherwise the payment evidenced by this receipt shall be returned on demand and the surrender of this receipt."

On August 4, 1917, Walet grew uneasy about his policy, and wrote the local agent as follows:

"I beg leave to inquire about my life insurance policy, I thought that it might have been mailed. I have not received it yet. Has it gone astray? Please let me hear from you."

To which the agent replied on August 6, 1917:

"The issuance of your insurance was delayed through Dr. King's delay in completing the examination. However, I am expecting Mr. Thompson out in a few days with your policy and several others which we have written."

"I regret very much this delay, but we urged Dr. King in every possible way to complete his work, which should all have been done on his first trip."

The policy was never issued. On the evening of the day that Walet wrote to the local agent to inquire about it, or on that of the next day, he was stricken with an acute attack of appendicitis, and was sent immediately to New Orleans for attention. There he underwent an operation on August 6, 1917, which was not over two days after he was stricken. The operation disclosed that Walet's appendix had ruptured. He died within 24 hours after the operation.

After some efforts on the part of the plaintiff to collect the amount of insurance for which application had been made, and after the refusal of defendant to pay it, plaintiff instituted this suit to recover the amount. She bases her cause of action on the contract evidenced by the receipt issued for the first

premium. She further pleads, in anticipation of defendant's defense, that the latter was grossly negligent in failing to give her husband's application the consideration to which it was entitled, especially in view of the acceptance by it of the first premium in advance, and of the fact that it had entered into the contract shown by the receipt, and that, in view of this negligence, and in view of the fact that defendant, having, to the injury of plaintiff and her husband, caused both to believe that the application had been accepted, is now estopped to deny that it was not.

Defendant first excepted to plaintiff's petition, but we need not notice the exceptions, as they are not urged in this court, and were overruled in the lower court. After the overruling of the exceptions, defendant answered, substantially, by denying its liability for the insurance claimed.

It appears that, when Dr. King went into the country to examine Walet on July 6, 1917, the day the application for insurance was signed, he did not have with him his instrument for testing the blood pressure. Therefore the question in the examination blank concerning blood pressure was not answered. Expecting to see Walet in town, and to make the test, Dr. King delayed sending the report to defendant. Disappointed in his expectation, he finally sent the report, with an indorsement thereon, stating the reasons for the delay, and that, if necessary, he would make the test as soon as possible, and send the report thereof to defendant. The report, without the blood test, was received at defendant's medical department, in New Orleans, on July 24, 1917, 18 days after the examination, and on the same day Dr. Hogan, who was connected with that department, wrote Dr. King as follows:

"Re Examination—John Douglas Walet.

"I have your examination of the above and note that you have not replied to question No. 4, Family History, 'Has there ever been any suspicion that any of those mentioned has ever had tuberculosis, consumption, insanity or cancer?' I also note that applicant had an acute attack of indigestion June 18th, but I can't make out the date of the year. I would like to know whether there was any involvement of the appendix or gall bladder. Please see Mr. Walet again and take his blood pressure and reply to all of these questions on the replica of the blank which I am inclosing, and forward your reply direct to the home office. Have applicant sign the blank and you witness his signature.

"Fill in on this letter the date you forwarded the replica to the home office and also the date of the attack of acute indigestion and whether this was the only attack he had. Thanking you for giving this your prompt attention, I am,

"Yours very truly,
                    "Earl A. Hogan, M. D."

Two days later, in reply to the above letter, Dr. King wrote that he had examined Walet and had obtained from him a statement in regard to the acute indigestion to the effect that he (Walet) was attacked suddenly, at about 2 o'clock p. m., on June 18, 1917, with a severe pain in the pit of his stomach, while at Lake Dauterive, about six miles from Loreauville; that the attack nauseated him, but that he could not vomit; that he sent for Dr. Darby, who gave him two hypodermics; that he then vomited, and felt relieved; that he had no pain afterwards up to the time of the report; that he had no fever the next day, but that the doctor advised him to remain in bed two days; and that in the interval between the attack and the report he had been attending to his business constantly. On the same day Dr. King made a report to defendant's home office, in which he incorporated the substance of the above report, and also made a report to that office on the blood pressure, which showed that while the applicant was sitting the pressure was 150. The report also answered in the negative the question as to whether there ever had been a suspicion that any member of the family, indicated in the form used,

had ever had tuberculosis, consumption, insanity, or cancer.

The first report, the one which failed to show the blood ·pressure, reached the home office three days after it reached the New Orleans office, and on the same day was examined by the medical department of the home office. The examination resulted in a tentative rating of 115, which meant that the applicant was subnormal, or belonged to a class in which the rating of mortality would be, from a medical standpoint, 115 per ·cent. of the normal rate, 100 being the standard. On the same day the application, with the report thereon, was sent to the revision desk of the issue division of defendant, which returned both on that day, and advised the medical department that an additional $10,000 had been requested, and on the same day the papers were re-examined and the tentative rating of 115 confirmed as to the original application for $10,000 insurance and as to the $10,000 additional insurance requested, subject to the receipt of the information which had been requested, and which had not yet reached the home office. This information reached that office four days later, and upon its receipt a re-examination of the papers in connection with it resulted in substituting a medical rating of 125 for the first rating made. This rating was not considered final for the reason that a report was desired and was still to be received from defendant's regular examiner at the place of Walet's residence, showing why it was that he had not been employed to make the examination, and asking for certain other information. Before that report was received Walet died.

It may be here said that, under the rules of defendant, an applicant for insurance for the amount, on the plan, and at the rate of premium applied for by Walet, with the latter's rating, is not an insurable risk. Still, had Walet not died when he did, and had the confidential report proved satisfactory, when received, the defendant would have been willing to have issued a substandard policy in the sum of $10,000 at a premium of $430.50 instead of $353.90, the premium shown in the contract or receipt, and in the application signed by Walet.

[1] By the terms of the receipt, which contains the only contract between the parties in the matter, it is evident that the insurance applied for was intended to take effect as of date June 26, 1917, but only upon condition that on that date, in the opinion of defendant's authorized officers in New York, Walet was an insurable risk, not simply on any terms or conditions, or at any premium, but, under its rules, on the plan and for the amount and at the rate of premium applied for, if found otherwise acceptable. It is equally clear that, for substantial reasons, up to the time that Walet died, the risk had not been found acceptable, under the rules of defendant, by its authorized officers, on the plan, for the amount, and at the premium applied for, but, to the contrary, it was found that, if Walet should be found insurable at all, it would be at a considerably increased premium. It follows, therefore, that the insurance on that plan and at the rate proposed did not become effective; and, as that was the only plan that defendant could accept or reject, being the only one submitted to it, it follows that insurance in no amount became effective.

[2, 3] Plaintiff, however, contends, as we have seen, that defendant is estopped to deny that it accepted the application. She bases this contention in part on the letter quoted above and written by Watts, defendant's local agent, in reply to Walet's letter of inquiry. While the letter is susceptible of the interpretation that the policy had issued, still, as the authority of Watts was limited, and as he had no power to bind defendant in respect to the issuance of the policy, it cannot be held that defendant is estopped by his representations. Moreover,

it does not appear that Walet ever read the letter, or even that his beneficiary ever read it prior to the former's death, for it was written on August 6th, on which day Walet was either undergoing the operation or was being sent to New Orleans for that purpose; and it is most unlikely, under the circumstances, that he ever saw the letter, or even that his beneficiary saw and read it prior to his death. Even had Walet received and read it in the midst of the attack, and he could not have received it earlier, still it is beyond question that no misstatement in it could have misled him to his injury, for certainly, at that time, he could not have obtained insurance elsewhere.

[4-6] Plaintiff, moreover, contends in part, as we have seen, that defendant is estopped to deny that it accepted the application, because it delayed passing on it, to her injury. Whatever relief, if any, may be afforded a proposed beneficiary for delay, under such an agreement as the one here involved, we do not think that delay can have the effect of preventing the company, receiving the application for consideration, from denying that it consented to the issuance of the policy. But, be that as it may, estoppel will not be enforced when it is against good conscience to enforce it. It would be contrary to such to enforce it here, for the reason that on June 26, 1917, Walet was not an insurable risk on the plan and at the rate proposed, if insurable at all; and it was his right to insurance, under the rules of defendant, according to that plan and at that rate, on that day, that it was agreed should determine the question. We say that he was not insurable on that plan, if at all, because, in our opinion, what was thought to be only an acute attack of indigestion, which he had eight days before, was, in reality, appendicitis, which resulted finally in a rupture of the appendix within two months thereafter. Even if we err in respect to his trouble, still the condition of Walet's health, as shown by the examination made, establishes that he was not entitled to the insurance on that day, on the plan and at the rate proposed; and it would be contrary to good conscience, under the circumstances, in our view, to treat the application as accepted.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and set aside, and that there now be judgment rejecting and disallowing plaintiff's demand, at her costs in both courts.

O'NIELL, J., being absent from the state, takes no part in the decision of the case.