## RAYMOND v. NATIONAL LIFE INS. CO.
(No. 1524; January 17, 1929; 273 Pac. 667)
(Rehearing denied March 12, 1929)

2

*John J. Spriggs,* for appellant.

4

6

*William E. Mullen* and *William E. Hardin,* for respondent.

8

*John J. Spriggs,* in reply.

RINER, Justice.

On September 26, 1926, Willard E. Raymond, residing at Lander, Wyoming, and engaged in business as an oil well driller in one of the oil fields located some distance from that town, made application to the National Life Insurance Company, a corporation organized under the laws of the state of Vermont and authorized to transact business in Wyoming, for a $2,500 policy of life insurance. In that application, over Raymond's signature, among other statements, there appears the following language, relative to the payment of the premium on the insurance sought:

"It is understood and agreed * * * (2) that if the amount of such premium is *paid* to the agent at the time of making this application the company shall consider and act upon said application in accordance with its rules and practice of selection; that if it is satisfied that I was at the time of my medical examination insurable upon the plan and for the amount of insurance hereby applied for, this application shall be approved and the insurance shall be effective in accordance with the terms of the policy applied for from the date of said medical examination, notwithstanding the provisions of the policy as to delivery in my lifetime and good health, which provisions, in event of, and in consideration of said advance payment, are hereby waived, and such policy will be delivered to me or to my personal representatives; but the company may at any time before delivery of said policy, on receipt of additional information, reconsider any approval hereof and. decline the insurance if it is not then satisfied that I was insurable on the date of said medical examination, and that if said company shall not be so satisfied the amount of premium paid shall be returned."

Raymond also stated in his application that:

"I understand and agree that the agent taking this application has no authority to make, modify, alter or discharge any contract hereby applied for.

"I hereby agree that this application and the answers made to the medical examiner and the policy applied for shall constitute the entire contract between the parties hereto."

The agent of the insurance company, one R. A. Williams, called on Raymond at the latter's home and they discussed the proposed application there and part of it was written up at that time. In the course of the conversation, the matter of the payment of the premium on the proposed policy was considered, and Raymond not having the money then, Williams told him that the Central Trust Company would advance this premium on the understanding that if the policy was not issued, the money would be returned and then delivered to the trust company, in order to cancel the note which Raymond would give the trust company to evidence the loan. Raymond assented to this arrangement and executed a note, due November 1, 1926, to the Central Trust Company for $17.13—this amount being the first quarter annual premium on the policy of insurance applied for by him. After concluding the discussion at the applicant's home, he and the agent went to the office of a physician residing in Lander, who conducted the medical examinations locally for the insurance company, and applicant submitted himself to an examination and also answered certain printed questions, the answers being written down immediately following them by the doctor. Among these questions and answers were the following:

"Q. Are you now in good health? A. Yes. Q. Have you ever had: dyspepsia, chronic diarrhoea, appendicitis, fistula, jaundice, gallstone colic, or disease of liver or bile passages? A. Yes, appendicitis, 1910. Q. Malaria, rheumatism, gout, scrofula, dropsy, cancer or other tumor? A. No. Q. Have you had sicknesses not already mentioned? A. No. Q. Have you ever received any serious injury, or undergone surgical operation? A. Yes, appendectomy, 1910; complete recovery. Q. When did you last consult a physician and for what? A. 1910, appendectomy."

Relative to these questions and answers, which were stated to be "in continuation of and forming a part of" Raymond's application to the National Life Insurance Company and relative to the application itself, at the conclusion

of the questions and answers, and over Raymond's signature, the following clauses are set out:

"I HEREBY CERTIFY that I have read all statements and answers in this application (Forms A and B), and agree, on behalf of myself and of any person who shall have or claim any interest in any contract issued hereunder: That no material circumstance or information has been withheld or omitted touching my past and present state of health and habits of life, and that said statements and answers, together with this declaration, are complete and true and shall be the basis of the policy hereby applied for; that there shall be no contract of insurance until a policy shall have been issued and delivered to me and the premium thereon paid to the company, or its authorized agent, during my lifetime and good health;"

After the medical examination of the applicant had been completed by the local physician, the latter, in response to an inquiry, told the agent, Williams, that as far as he knew, he would recommend the applicant. Thereupon Raymond was given by the agent a receipt for the amount of the premium above mentioned and the latter then read to the former the provisions on the back of that receipt, which contained the language quoted above and numbered (2). The receipt itself stated that:

"Said payment is made subject to the terms and conditions of agreement 2 contained in said application, as per copy on the back of this receipt."

Subsequent to giving the receipt to the applicant, the agent informed him that this receipt placed the insurance applied for in force "subject to the investigation which the company always makes." Raymond was also told by the agent that a check-up would be made by the insurance company to determine whether the applicant's answers to the medical examiner and in his application were true and correct, and whether he was a good moral and financial risk; whether his occupation was particularly hazardous

and various other matters to be considered by the company in connection with the applicant's insurability; the agent further told Raymond that if he paid the premium in advance and proved to be a good risk, and the "check-up was O. K." with the company, he would be insured from the date of the medical examination if the application was approved. Applicant's wife testified that at their home the agent told Raymond that "if he would be examined that day, he would be insured from that day on." She stated also, however, that being engaged in household duties, she was in and out of the room where the conversation of the agent and her husband took place and did not hear all of it.

The application, including the medical report with its accompanying questions and answers, as well as the premium of $17.13 advanced by the Central Trust Company, was then sent by the agent Williams to the general branch office of the insurance company at Salt Lake City, Utah, whence it was transmitted to the home office of the company at Montpelier, Vermont. The application was received there by the company's medical department, on October 4, 1926, and on that day conditionally approved. A policy conforming to the application was written up and sent to the Salt Lake general office, with instructions, however, not to deliver it "until released by wire or letter from home office."

Meanwhile the general agent of the company, in accordance with the company's general practice under such circumstances, had called for an inspection report regarding the applicant from a mercantile agency, which, on October 13, 1926, advised that it had not been able to secure a report on the applicant but hoped to have such a report soon. This indication of progress in the matter was received at the home office medical department of the company on October 18, 1926. On October 15, 1926, the mercantile agency sent in another rather extended report, received at the home office medical department in Montpelier on October 19, 1926, wherein it was stated, among

other things, in substance, that the agency had learned that the applicant had had stomach trouble the preceding winter. Acting immediately upon this information, on the date last mentioned, the assistant medical director of the company wrote a letter to the local physician at Lander who had made the original medical examination, asking for details of any stomach trouble which the applicant had experienced within the preceding two years. This communication was received by him about the 25th or 26th of October, 1926, and thereupon the doctor—to use his own language on the witness stand—"looked around all he could to see if he could find" the applicant; "I didn't know until they told me yesterday where he worked; as a matter of fact, it was my opinion that he lived at the oil field." The physician was at that time engaged in an active practice which required his attention. Finally, on November 5, 1926, he obtained, through a nurse in his hospital who had then just returned from a trip to Thermopolis, Wyoming, information which on that day caused him to respond to the letter of inquiry aforesaid by a telegram to the assistant medical director of the home office of the company in Vermont, reading:

"Your inquiry October nineteen Willard E. Raymond history stomach trouble stop Unable to get in touch with him stop Reliably informed today he is away being treated for stomach and expects operation stop Advise declination"

This wire was received at that office the following day, and on that day the application was declined by the company and the policy recalled. November 8, 1926, notice of this declination by the company appears to have been sent to its Salt Lake City office. On November 9, 1926, Raymond's death occurred at Thermopolis, Wyoming, caused through perforation of the gall bladder and duodenum by gallstones and shock of an operation to which applicant had submitted himself.

14

About November 13, 1926, the money sent with the application in payment of the premium on the policy applied for was returned to the local agent of the company, Williams, who immediately turned the money over to the Central Trust Company, and the latter cancelled Raymond's note for the amount. On that day also, having information of the company's declination of the application, the local agent wrote the applicant's wife concerning the refusal of the company to assume the insurance, and demanded a return of the receipt for the premium payment previously issued by him to Raymond.

The insurance company asserted its non-liability for the death claim, and suit was instituted against it in the District Court of Fremont County by the wife of applicant in her own right—and not as executrix or administratrix of the estate of her deceased husband, she being the person designated in the aforesaid application as the party to whom the applicant desired the insurance made payable.

Plaintiff's fourth amended petition contains three alleged causes of action, the relief sought by the first of which is that the defendant be required to make and deliver to plaintiff the insurance policy applied for; the second asks a money judgment for the amount of the proposed policy and interest; and the third seeks damages for the alleged negligence of the defendant in handling the matter and in unreasonably delaying action upon Raymond's application. Defendant's answer pleading the untruthfulness of certain statements and responses to questions contained in Raymond's application, some of which have hereinabove been recited, and traversing generally and specifically the allegations of plaintiff's petition, in substance disclaims all liability for the loss, and asserts that no contract of insurance had ever been consummated between the parties. The answer also negatives all charges of negligence on the part of the company in handling the matter and averred facts claimed to show that it acted reasonably and promptly upon the application in view of

the more than two thousand miles of distance between Lander and the home office of defendant in Vermont. A reply was filed putting in issue many of the affirmative allegations of the answer, admitting, however, that the statements and answers contained in the application were made by Raymond as pleaded in the answer, and reiterating the claims of the plaintiff, as set out in her petition.

A jury having been demanded to determine the issues, trial of the case was had, and upon its conclusion defendant moved for a directed verdict on the ground of insufficient evidence to warrant a verdict for the plaintiff. This motion being overruled, the case was submitted, and subsequently the jury returned separate verdicts in favor of the defendant on the first, second and third alleged causes of action, respectively, of plaintiff's pleading. Judgment was entered on these verdicts against plaintiff, and the record has been brought here by her through direct appeal for review.

The facts disclosed by the submitted case, and which we consider material to its disposition, have in large measure been already mentioned. Whatever else may be necessary to be considered will be referred to in the further course of this opinion.

A great many errors have been assigned by appellant in her attack upon the judgment below, and we have given careful consideration to them all, but in the view which we entertain of the record presented, it will be unnecessary to examine them here *seriatim*. The facts which, we think, should control the disposition of this lawsuit are, if at all, very slightly in dispute. There are also certain legal principles applicable which have heretofore been mentioned by this court, which may with advantage be reviewed at this point.

In Summers v. Mutual Life Insurance Co., 12 Wyo. 369, 75 Pac. 937, 66 L. R. A. 812, 109 Am. St. Rep. 992, speaking of the formation of contracts for life insurance, it was said:

"Where acceptance or delivery is necessary to put the insurance into effect there will, of course, be no risk until the things precedent agreed upon shall happen. * * *

"The rule is not, therefore, that *every* contract for insurance will authorize recovery in case of loss in the absence of a policy, independent of other agreements or conditions. The agreement itself, or the application, may show that the contract was not one for present insurance, but for insurance to take effect in the future, depending upon some condition, such as the acceptance of the application, or delivery of the policy, or upon the performance of some act, such as the payment of premium. * * *

"It is probably safe to say that it is a matter of common knowledge that policies of life insurance are generally written at the home office, or at least by some principal officer, which also usually has the right of acceptance or rejection of the risk."

In Wheelock v. Clark, 21 Wyo. 300, 131 Pac. 35, Ann. Cas. 1916 A, 956, where the nature of an application for life insurance was under consideration, the language of Judge Sanborn in Travis v. Nederland Life Insurance Co., 104 Fed. 486, 43 C. C. A. 653, was quoted to the following effect:

"'An application for life insurance is not a contract. It is only a proposal to contract on certain terms which the company to which it is presented is at perfect liberty to accept or reject. It does not in any way bind the company to accept the risk proposed, to make the contract requested, or to issue a policy. * * * Until the meeting of the minds of the parties upon the terms of the same agreement is effected by an acceptance of the proposition contained in the application, or of some other proposition, each party is entirely free from contractual obligations. The applicant may withdraw his application and refuse to take insurance on any terms. * * * Nor is the freedom of the parties to retire from the negotiations or to modify their proposals, at any time before some proposition has been agreed upon by both, ever lost or affected by the fact that the applicant accompanies his proposal or application with a promise to pay the premium in the form of promissory notes, or even by an actual payment thereof. Until his application is ac-

cepted, such a promise or payment is conditional upon the acceptance, and his application is still no more than a proposition to take and pay for the insurance if the company accepts his terms.' ''

Of similar purport with the statements made in these cases is the language of the Circuit Court of Appeals for the Fourth Circuit, in Miller v. Northwestern etc. Co., 111 Fed. 465, where it appeared that the applicant gave his check for the amount of the first premium on the applied for insurance to the agent, upon the latter's statement that if he did so the insurance would be in effect from that date, but that the company would have to approve the application. Considering this feature of the case the court remarked:

"We think the court may take judicial notice of the way in which contracts for insurance are usually regulated. Abb. Tr. Ev. (2d Ed.) p. 590, par. 5. There is nothing here to support the theory that John was invested by this company with any power or authority beyond that usually confided to local life insurance agents; that is, to explain the character of their principal's business and operations, and to solicit and forward applications or proposals for policies, accompanied by the statements of applicants and the necessary medical examinations. It is true that John stated to the applicant at the time of the payment of the premium, or about that time, that if the premium was paid the insurance would take effect from that time; but he then and there qualified this statement by saying that the company would have to approve it, to which the applicant assented. It is thus shown that applicant understood fully at the time the premium was paid to John and the application forwarded that there was no contract, and that the application must be passed upon and approved by the company at its home office before it became binding upon the latter."

The first contention of applicant to be examined in the light of these principles, is that the soliciting agent of the defendant, Williams, and its local medical examiner, Dr. Replogle, were authorized to make and did make a lawful

and binding insurance contract with Raymond on September 26, 1926—the day the application was signed and the medical examination made. There are several matters which, upon due consideration, we think, establish that this contention is untenable. First, there is nothing in the record before us—as in the Miller case, supra—which shows that either the soliciting agent or the medical examiner at Lander possessed any unusual powers as regards making an insurance contract with the defendant. It is elementary law that the scope of an agent's authority cannot be proven merely by the agent's acts, representations, declarations or admissions, and also that it is the duty of all who deal with him in his representative capacity to inquire into the extent of that authority. As a matter of fact, neither the agent, who solicited the insurance, nor the medical examiner, nor both of them, were authorized to conclude contracts of insurance on behalf of the defendant.

Again, the applicant Raymond knew that this was so, for over his own signature he distinctly stated that he understood and agreed that the agent taking his application had no authority to make, modify, alter. or discharge any contract of insurance applied for. This statement obviously indicated that he was aware that only the general officers of the company could close the insurance contract sought by the applicant, and that it would not come into existence until they had done so.

The limited nature of Williams' and Replogle's authority in the matter was further called to Raymond's attention when he stated in his application that the company—not the soliciting agent nor the local medical examiner—might at any time before delivery of the policy sought, on receipt of additional information, reconsider any approval of such application and decline the insurance if it were not then satisfied that the applicant was insurable on the date of the medical examination. It will be remembered that the policy applied for had not been delivered, though it had been written and sent to the Salt Lake general office of

the company conditionally. The receipt for the advance payment of the premium, which was signed by Williams and given to and accepted by Raymond, also carried on its face a statement that it was delivered subject to such an arrangement. The legal effect of authority granted or reserved to the company—whether by the terms of the application or the receipt for premium money—to additionally investigate an application for insurance after the local medical examiner has made his report, and to approve or reject it upon further information obtained by the company as it may be fairly satisfied therefrom that the applicant was insurable, is reasonably clear from the reported cases in point.

In State ex rel. Equitable etc. Co. v. Robertson, 191 S. W. (Mo.) 989, one of the questions before the court was whether there was a completed contract of insurance. The applicant had paid a premium upon the applied for insurance, and a receipt was then given him which provided that the contract should take effect as of the date of the receipt, provided the applicant was on that date, in the opinion of the company's authorized officers in New York, an insurable risk under its rules, and the application was otherwise acceptable on the plan and for the amount applied for. The court said in part:

"What was Kempf's proposition to the company? An application for insurance on his life, to be evidenced by an ordinary life policy for the sum of $5,000; and in said application he proposed to pay semi-annually therefor, in advance, the sum of $111.25. It is thus seen that Kempf applied to relator for the insurance on the plan stated in his written application; and the receipt given by the latter to the former provides that it is to take effect as of its date, but only upon condition: First, that the applicant was on that date, in the opinion of the company's authorized officers in New York, an insurable risk under its rules; and, second, that the application was otherwise acceptable on the plan and for the amount applied for. * * *

"The undisputed evidence shows that the application of Kempf as presented to the company was not acceptable to

the New York officers, and the record discloses the fact that the company rejected the application as made and tendered to it, and also that it made to him the counter proposition of insurance before mentioned, which was never accepted; he having died before it reached him. As to the testimony of Nelson, it is not contradictory of the receipt or the application mentioned, nor of the terms of the policy mentioned. While he stated that the insurance was to be in force and effect from and after the date of the receipt, yet he added 'provided it (the application for the insurance) is approved at the home office, we always state that.' This testimony substantially conforms to the terms of the receipt, and the application for the insurance was not to be effective until the officers of the company in New York approved the application, which was never done, as before stated.''

In Olson v. American Central Life Insurance Co., 172 Minn. 511, 216 N. W. 225, the following language was used:

''It is well settled that an application for life insurance is a mere proposal and like any other offer does not become a contract until accepted. Heiman v. Phoenix M. L. Ins. Co., 17 Minn. 153 (Gil. 127), 10 Am. Rep. 154; Hertz v. Security Mutual Ins. Co., 131 Minn. 147, 154 N. W. 745; Sawyer v. Mutual Life Ins. Co., 166 Minn. 207, 207 N. W. 307; 32 C. J. 1102; 37 C. J. 380. * * *

''That the assent of both parties to the same set of terms is necessary to create a contract is axiomatic. An offer never becomes a contract until accepted. Where an application provides that the insurance shall not take effect until the approval of the application by the insurer, no contract of insurance exists prior to such approval, although the application also provides that the policy shall bear the same date as the application and that the time covered by the premium shall be measured from that date.'' Citing many cases.

The case of Northwestern Mutual Life Insurance Co. v. Neafus, 145 Ky. 563, 140 S. W. 1026, 36 L. R. A. (N. S.) 1211, presented the question whether the applicant for life insurance was insured from the date of his local medical examination under the terms of the receipt given him for

his premium payment. The following excerpts from the opinion show clearly the tenor of the decision, to the effect that the jury should have been instructed to return a verdict for the insurance company:

"The receipt is not complicated or difficult to understand. It is a brief, plainly written paper that any person of ordinary intelligence could readily and easily comprehend the meaning of. Nor is it susceptible of two interpretations. It states that an application for a $1,000 policy having been made by T. J. Neafus to the company, there has been collected of him $27.71, to be considered the first annual premium on said policy, provided the application is approved by the company at its home office, and, in that event, the insurance, as applied for, will be in force from the date of the medical examination. It is plain that to construe this receipt into an obligation on the part of the company that it had insured Neafus from the date of the medical examination until he was rejected would make a radical and material alteration in its terms. To so construe it, we must make the receipt read, in substance, that in consideration of the premium the insurance, as applied for, will be in force from the date of the medical examination until the application has been approved or rejected by the company, thereby putting into the receipt words that cannot be inserted without giving to it a meaning entirely different from what it was intended to have, and making in fact a contract between the parties that neither of them at the time had in mind. * * *

"There is nothing unfair or unreasonable or oppressive in the conditions of this receipt. It is simply a proposition made by the company to the applicant. It in substance tells him that if he wants insurance he can pay the first premium, submit to a medical examination, and then, if the company regards him as a desirable risk, it will issue to him a policy that will relate back to and be in effect from the date of the medical examination. When the applicant accepts this proposal, he agrees to its terms and conditions, and cannot be excused from knowing when his insurance will begin. If we should say that under the receipt the applicant was insured from the date of his medical examination, although the company might reject the application, we would put the company in the attitude of insuring a person, whether he was a desirable risk or not. It would

place upon it the burden of carrying, without its consent, a risk that it did not and would not assume. Take this case as an illustration. Neafus was not a desirable risk. No company would have given him insurance. But, if the construction contended for is to obtain, the fact that he applied to an agent for insurance, and submitted to a medical examination that showed him not to be a suitable subject for insurance, must be held to give him insurance from the date of his examination, until the company has had opportunity to reject his application. We cannot give the receipt the construction contended for.''

The controlling question in Muhlbach v. Omaha Life Insurance Co., 107 Nebr. 206, 185 N. W. 447, was the existence of a life insurance contract between defendant and the applicant at the time of the latter's death. He had applied for insurance January 17, 1919, and four days later was killed in an accident. He had paid the premium due on the proposed insurance, but after only a part of the medical examination had been made, he left the office of the medical examiner and did not return. The home office of the company, in acknowledging receipt of the premium, had written to Muhlback stating that ''upon receipt of the medical and approval, policy will go forth.'' In the application was a statement: ''Date my policy January 17, 1919.'' It was argued that there was a contract of present insurance. At the trial a directed verdict was instructed for the defendant and in affirming this action the appellate court said:

''The first annual premium paid was not the entire consideration for insurance. Statements to the medical examiner were parts of the consideration. The application so declares. Following the answers to questions relating to family history and to other questions material to an insurance risk, the application declares:

'' 'The foregoing statements and answers, and also those made to the company's medical examiner, are true and full, and they are offered as a consideration of the policy contract.'

"The application itself, therefore, contemplated statements and answers in addition to those found therein. * * *

"The premium paid was the price of a risk for an entire year on the twenty-payment plan, and there is nothing to indicate that any part of it was intended to cover a temporary risk pending further inquiry and investigation. Both insurer and applicant, in negotiating for life insurance, should contemplate an investigation sufficient to disclose all facts essential to an insurable risk and to reputable underwriting, since this is required by honest business and common sense. If these tests could be safely used in determining the amounts of annual premiums, policy holders and insurers generally would be alike benefitted. Part of the applicant's consideration for life insurance on the twenty-payment plan failed—disclosure of physical conditions and family history. As a result, the risk was not approved and the policy was never issued. A life insurance risk, before the issuance of a policy for which an application has been made, is not assumed until the minds of both applicant and insurer meet on definite terms to that effect. * * *

"In conducting its life insurance business, defendant followed the practice of requiring an independent investigation into the family history of each applicant. This would have resulted in the information, contrary to the representations in the application, that the father and the mother and a sister of Muhlbach had been insane. With this information at hand, defendant would not have issued the policy for which the applicant applied."

Gonsoulin v. Equitable Life Assurance Society, 152 La. 865, 94 So. 424, was a case where the premium receipt declared that the insurance should be effective from its date, provided the applicant was on that date, in the opinion of the insurer's authorized officers in New York, where the home office of the society was located, an insurable risk and the application was otherwise acceptable on the plan, for the amount and at the rate of premium applied for. The application was dated July 6, 1917, medical examination made the same day, and premium then paid. While the branch general, and home offices of the society were seek-

ing additional information in regard to applicant's health history, he was stricken with an attack of acute appendicitis, underwent an operation on August 6, 1917, and died within twenty-four hours. In reversing a judgment for plaintiff, the clause in the premium receipt was discussed in the following language:

"By the terms of the receipt, which contains the only contract between the parties in the matter, it is evident that the insurance applied for was intended to take effect as of date June 26, 1917, but only upon condition that on that date, in the opinion of defendant's authorized officers in New York, Walet was an insurable risk, not simply on any terms or conditions, or at any premium, but, under its rules, on the plan and for the amount and at the rate of premium applied for, if found otherwise acceptable. It is equally clear that, for substantial reasons, up to the time that Walet died, the risk had not been found acceptable, under the rules of defendant, by its authorized officers, on the plan, for the amount, and at the premium applied for, but, to the contrary, it was found that, if Walet should be found insurable at all, it would be at a considerably increased premium. It follows, therefore, that the insurance on that plan and at the rate proposed did not become effective; and, as that was the only plan that defendant could accept or reject, being the only one submitted to it, it follows that insurance in no amount became effective."

It is unnecessary to multiply further citations along this line, although many more could be furnished. As remarked by Judge Sanborn in the Travis case, supra, the application of Raymond was merely an offer, a proposal on his part for insurance upon certain terms, at the same time advising the insurance company that before it decided to finally accept his proposal, it might make certain additional investigations to satisfy itself of his being insurable at the time his medical examination took place. His insurance was to be effective from that date in the event such final acceptance occurred. It is plain that life insurance is a contract. The meeting of the minds of the parties is vital to the execution of a policy. Honest, trustworthy

underwriting demands careful inquiry into the moral character, habits, family history, financial standing and physical condition of an applicant for life insurance. A considerable degree of scientific knowledge and professional skill are necessary to accomplish due inquiry. Under the application before us in the instant case, it is clear that the insurance company, in soliciting the risk, and the applicant in seeking indemnity contemplated an investigation in keeping with the hazard involved. Viewing the situation in which the parties stood at the time the application was written, with the soliciting agent in Lander, the branch general office in Salt Lake City, Utah, and the home office of the company nearly on the Atlantic seaboard, and with the applicant working at an oil field drilling camp located at considerable distance in the country away from Lander, necessarily any supplementary investigation required time within which to make it.

As we read the terms of the clause '' (2) '' supra, appearing in both the application and on the premium receipt in the case at bar, as already intimated, the risk was to take effect on the date of the medical examination, if the company finally accepted Raymond's application after such an additional investigation—reasonably and in good faith made—as satisfied the company concerning his insurability on that date. When that was done, the insurer was willing that the risk should so commence, although the execution of the policy, embodying all the terms of the contract, might be delayed for a considerable period. Any other construction of the clause would, we think impose upon the company heavy liabilities for temporary insurance before the chief medical officers of the company had any time or opportunity to examine and approve risks, and before any thorough and careful independent investigation thereof could possibly be made. We find nothing whatever in the record impugning the good faith of the company in making the additional investigation relative to applicant's history of stomach trouble.

Our conclusion upon this branch of the case is, therefore, that no contract for insurance was completed between the parties, and this result is in entire harmony with the authorities herein cited presenting somewhat similar situations and with whose reasoning we are in accord.

It is said that elements of waiver and estoppel appear in the case against the insurance company. We do not so interpret the record, and, as said in the Gonsoulin case, supra:

"Plaintiff, however, contends, as we have seen, that defendant is estopped to deny that it accepted the application. She bases this contention in part on the letter quoted above and written by Watts, defendant's local agent, in reply to Walet's letter of inquiry. While the letter is susceptible of the interpretation that the policy had issued, still, as the authority of Watts was limited, and as he had no power to bind defendant in respect to the issuance of the policy, it cannot be held that defendant is estopped by his representations."

There being no cause of action established in plaintiff's favor upon an alleged contract of insurance, there remains to be examined the charge of negligence on the part of the company in handling and disposing of Raymond's application.

It seems to be pretty well settled by the weight of authority that mere delay in passing upon an application for insurance cannot be construed as an acceptance of it by the insurance company, which will support an action *ex contractu*. See Bradley v. Federal Life Ins. Co., 295 Ill. 381, 129 N. E. 171, 15 A. L. R. 1026, and extended list of cases cited in the note. Of late years, however, some courts have held that a liability in tort exists against insurers where they have failed to act upon an application and there has been a subsequent loss not covered by insurance. Duffie v. Bankers etc. Co., 160 Iowa 19, 139 N. W. 1087; 46 L. R. A. (N. S.) 25; Wilken v. Capital etc. Co., 99 Nebr. 828, 157 N. W. 1021. But there is authority to

the contrary: Interstate Business Men's Accident Association v. Nichols, 143 Ark. 369, 220 S. W. 477; National etc. Co. v. School District, 122 Ark. 179, 182 S. W. 547; L. R. A. 1916D, 238.

The decision in Evans v. International Life Insurance Co., 122 Kans. 264, 252 Pac. 266, is pertinent to the phase of the instant case now being considered. There plaintiff and her husband made a joint application to the insurance company for an ordinary life policy, she being named as beneficiary of her husband, and he as hers. The application was written partly by defendant's soliciting agent and in part by its local medical examiner. The latter wrote the answers made by the plaintiff and her husband to the several questions in the medical examination blank, which answers were stated to be "full, complete and true." The application was completed and forwarded to the home office of the company July 31, 1922, and in response a letter was sent by that office to the soliciting agent, where it was said that the policy applied for would be delivered when additional information was obtained concerning the matter referred to in one of the wife's answers to the questions in the medical examination, and this additional information must be "satisfactory to the company." The answers of the husband would appear to have been satisfactory. While endeavoring to obtain this information as to the wife, plaintiff's husband died, August 15, 1922. Action was brought for the alleged negligence of the medical examiner in setting down plaintiff's answers and for the local agent's failure to deliver the policy. Plaintiff prevailed below, but the reviewing court reversed the judgment and said, in part:

"Here no policy had been delivered. The negotiations between the parties were not completed. The joint application was submitted to the company, together with a note for the premium, for its acceptance at its home office in St. Louis. It was promptly examined, and found to be unsatisfactory in the one respect. Continuing the negotiations, the company requested a signed statement by the

local medical examiner, satisfactory to itself, as to the plaintiff's illness disclosed by her application. It was not beyond its rights in doing this before concluding the negotiations and accepting the risk. Before it received the explanation, plaintiff's husband died. The company then refused to deliver the policy and returned the premium note which had accompanied the application. The delay in the delivery of the policy occasioned by the agent's attempt to procure an explanation cannot be said to have been negligence. Therefore no negligence was attributable to the defendant because of the delay between the receipt of his instructions from the company and the death of plaintiff's husband. If the medical examiner had deliberately returned a false answer to his company (which is in no wise charged here), plaintiff, in our opinion, would be in no better position. It was the duty of both the plaintiff and the medical examiner to give the insurance company correct information.''

See also DeFord v. New York Life Insurance Co., 81 Colo. 518, 256 Pac. 317.

We do not find it necessary in the case at bar to determine which of the divergent lines of authority above referred to we should adopt in this jurisdiction, for here the court submitted to the jury the question whether the defendant had acted within a reasonable time in all matters relating to the insurance of Willard E. Raymond, and the jury made its finding in defendant's favor. The effect of the jury's verdict was, of course, to relieve the defendant of any charge of negligence set forth in plaintiff's third cause of action. A careful and impartial consideration of the undisputed facts before us in the case leads us to say that it is doubtful if any other conclusion could properly have been reached by the jury. We find no fault in the instruction which presented this matter to that body, assuming that the question should have gone to it. In addition to all this, it may further be said that it is open to query whether plaintiff possessed legal capacity to sue on the alleged third cause of action incorporated in her pleading. See DeFord v. New York Life Insurance Co.,

75 Colo. 146, 224 Pac. 1049; Duffie v. Bankers Life Association, supra; also Bradley v. Federal Life Ins. Co., 295 Ill. 381, 129 N. E. 171; 15 A. L. R. 1021.

It is urged also by appellant that the premium sent in to the company with Raymond's application was never returned by it. The record, however, shows that this is not the fact. It is undisputed that the arrangement made by the applicant with the soliciting agent of the company, Williams, was that if the application was not accepted, the money should be returned to the Central Trust Company, which had advanced it, and Raymond's note cancelled. Both of these things were done.

Much argument is employed and many cases are cited in appellant's brief concerning the admission and rejection of evidence and instructions given and refused by the court in submitting the cause to the jury. But in view of the facts in the case established beyond controversy which we have considered, and in the light of the authorities we have reviewed above, we do not think these material to a correct disposition of the appeal.

As we find no prejudicial error in the record, the judgment appealed from should be affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.

Rehearing denied March 12, 1929, without opinion.