McAvoy Vitrified Brick Company *v.* North American Life Assurance Company, Appellant.

Argued January 14, 1959. Before Jones, C. J., Bell, Musmanno, Jones, Cohen and McBride, JJ.

*Owen B. Rhoads,* with him *William H. Lowery,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*J. B. H. Carter,* with him *Francis E. Shields, Francis H. Scheetz,* and *Pepper, Bodine, Frick, Scheetz and Hamilton,* for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, March 16, 1959:

This appeal is from a judgment in favor of the plaintiff company in the sum of $243,202.31, entered by the court below in an action of assumpsit based on an alleged contract of interim insurance on the life of Thomas B. McAvoy. The plaintiff company of which Mr. McAvoy was president was the designated beneficiary in his application to the defendant company for insurance. McAvoy submitted to the required physical examination and was approved by the defendant's medical examiner for the insurance applied for. Following the medical examiner's examination and approval of the applicant, the insurance company's authorized agent accepted McAvoy's payment in full of the first year's premium on the contemplated policy and delivered to him a "deposit receipt" and an "interim assurance certificate". Six days after his examination and approval by the insurance company's medical examiner, McAvoy died and, following his death, the company rejected the application for the assigned reason that, under the company's practice, the applicant was not an insurable risk for the amount of insurance requested.

The case was tried to Judge WATERS of the court below without a jury pursuant to agreement of the parties to the record. The trial judge held that the "deposit receipt" and the "interim assurance certificate" constituted integration of a contract of insurance

between McAvoy and the defendant company for the period between the agent's delivery of the interim assurance certificate and the ultimate decision of the defendant company at its home office whether to issue the policy applied for or reject the application. Judgment for the plaintiff beneficiary was entered accordingly. The defendant filed exceptions to the judgment so entered, contending that, on the basis of the record and testimony, the trial judge should have found in favor of the defendant company and, in the alternative, that the defendant is entitled to a new trial because of alleged errors in the trial judge's rulings on the admission of evidence.

In passing upon these exceptions, the court *en banc* said *in limine* that it was not disposed to view seriously the latter of the above stated contentions, saying in that connection: "There has never at any time been any substantial dispute of fact. The case was presented as one involving questions of law that would be determinative of the issues and hence was one appropriately submitted to the court sitting without a jury. . . . None of the alleged irregularities during the trial of this case are of sufficient significance to affect the result. The facts were fully and fairly presented and it remains only to apply the law applicable in the circumstances." The foregoing conclusions were well warranted by the record; and nothing more need be said on that score.

We are fully persuaded of the correctness of the judgment entered below. Any further opinion by us in support thereof could at best be no more than a paraphrase of what was so well expressed by Judge WATERS for the court below, or else, a work of supererogation. We therefore affirm on the following excerpts from the opinion of Judge WATERS:

"McAvoy Vitrified Brick Company, desiring to expand its operations, sought to borrow $400,000 from Girard Trust Corn Exchange Bank. As an incident of this transaction, the bank requested that the company obtain insurance on the lives of the McAvoy brothers, Thomas B. Jr. and John C., respectively president and vice-president of the McAvoy Vitrified Brick Company, in the amount of $200,000 each. Through Messrs. Johnson & Higgins, insurance brokers, the McAvoys inquired of a number of life insurance companies regarding a plan of reducing term insurance to be coordinated with the amortization of the contemplated loan. Among these companies was the defendant, which, through its Philadelphia branch manager, submitted schedules of commuted values of reducing term policies of insurance. The McAvoys decided to apply for insurance with the defendant, and arrangements were made for them to undergo a physical examination by two physicians selected by the defendant. This examination took place on June 28, 1955. After the examination, on the same day, the brothers were informed by the defendant's branch manager that Thomas, the elder brother, was physically acceptable at the standard premium rate but that the physicians had found John's blood pressure too high for him to be so acceptable. Thomas B. McAvoy, Jr. thereupon, on June 28, 1955, filled out and delivered to the defendant's branch manager an application, on the defendant's printed form, for the desired policy of insurance, and handed to the branch manager a check payable to the defendant in the amount of $2,966.75, representing the full first year's premium on the policy requested. The application designated the plaintiff company as beneficiary and was for a policy which would provide for the payment, in the event of the insured's death during the term, of $1,455 monthly for

a period of fifteen years, the commuted value of which was calculated at $211,266. The branch manager of the defendant then signed and delivered to Thomas B. McAvoy, Jr. a 'deposit receipt' and an 'interim assurance certificate.' These two documents will have to be considered in detail, because they, with the application, constitute the integration of the contract between the parties if any contract existed.

"Thomas B. McAvoy, Jr. suffered a coronary thrombosis on July 3, 1955, and died the same day. Obviously, no policy had been issued at that time. As a matter of fact, the application was on the desk of the defendant's underwriting officer in Toronto for consideration on the very day when the word of McAvoy's death was received.

"The plaintiff contends that by the application, deposit receipt, and interim assurance certificate the parties entered into a contract of temporary insurance which was effective immediately and which would continue to exist until the defendant either issued a policy or declined to accept the risk during the life of the insured. The defendant, on the other hand, while conceding that the exchange of the application and premium payment for the deposit receipt and interim assurance certificate created a contractual relationship, urges that the defendant's liability under the contract was subject to a condition precedent, the defendant's determination that Thomas B. McAvoy, Jr. was an insurable risk under the defendant's practice. The problem is not a new one. A substantial volume of litigation has come before the courts arising out of situations in which one who has applied for life insurance and paid a premium has died or suffered a change of physical condition before the issuance of the policy. We are all familiar with the usual practice of insurance agents to accept initial premium payments with

applications for the issuance of policies which cannot, in the very nature of the business, be made available until some time later. The policy itself, when issued, embodies the contract. But in the meantime, between the initial payment of premium and the issuance of the policy, what is the contractual relationship, if any? It is not possible to generalize; the courts have found the answer in each case in the wording of the receipt given for the premium payment, where the language clearly discloses the intention of the parties, and where the courts have found ambiguity in the language they have usually reached a construction against the insurance company which drafted the receipt.

"A receipt for a premium payment which recites that the applicant shall be covered by insurance if and when the company shall issue a policy on the plan applied for, or if and when a policy shall be delivered, admits of only one interpretation: the application is an offer to contract, and no contract comes into being until the insurance company manifests its acceptance of the offer. A like result would be accomplished by a receipt stating clearly that no insurance shall be in effect until the time of the application's approval by the home office of the company. The doubtful cases arise where a receipt is given stating that the insurance shall be in effect from the date of the premium payment, or the date of the application, or the date of the medical examination, provided, as in some instances, the application shall be approved and accepted at the home office, or, as in others, the home office shall be satisfied that, at the time of the payment, application, or examination, the applicant was an insurable risk. Thus in an informative comment in 44 Yale L. J. 1223 the author refers to receipts which state that (1) any insurance effected shall by reason of the payment of the premium at the time of the applica-

tion be in force from the date of the medical examination provided the application shall be approved and accepted as applied for at the home office, and receipts which state that (2) the insurance shall be effective as of the date of the medical examination if the company shall be satisfied that on that date the applicant was an insurable risk and that the application was otherwise acceptable under the company's regulations for the amount and plan of the policy applied for.

"In this case we have more than a receipt for the premium payment; we have in addition an interim assurance certificate. We believe that this shows the intention of the parties to effect present insurance coverage pending action by the company at its home office. Certainly if the parties so intend, a valid and binding contract of this kind may be made. If by the interim certificate, in addition to the receipt, the parties did not intend that the applicant should be covered in the interim, then the interim certificate becomes a mere nullity.

"The receipt itself in the instant case does not fall into either of the above-mentioned categories, but it contains language which is highly persuasive that a contract of interim insurance was contemplated. It reads: 'Deposit Receipt. Issued in consideration of, and in connection with, an application to the North American Life Assurance Company corresponding in number and date with this receipt. Received from The McAvoy Vitrified Brick Co. the sum of $2,966.75 Dollars as a deposit to be applied on account of the first premium under the policy applied for, if and when issued. If the policy is not issued the amount received will be returned on surrender of this receipt. Dated at Philadelphia, Pa., this 28th day of June, 1955. Benjamin M. Gaston, Br. Mgr., Representative. UNDER NO CIRCUMSTANCES WILL THE COMPANY ASSUME ANY LIA-

BILITY UNTIL A POLICY HAS BEEN DELIVERED AND THE PREMIUM HAS BEEN SETTLED IN FULL, UNLESS AN INTERIM ASSURANCE CERTIFICATE HAS BEEN ISSUED, CORRESPONDING IN NUMBER AND DATE WITH THE APPLICATION AND WITH THIS RECEIPT. This receipt is not valid nor binding on the Company unless countersigned by a duly authorized Representative of the Company.'

"The upper-case sentence in this receipt is significant. Standing alone, the receipt is unambiguous. It clearly rules out the possibility of a contract for interim insurance; the company assumes no liability until a policy has been delivered. But the proviso 'unless an interim assurance certificate has been issued' reopens the door to the possibility of interim insurance and sends us to the certificate (for in this case one was issued) to determine the parties' intention.

"The interim assurance certificate was signed by the same representative and branch manager and bears the same date as that of the deposit receipt. It also bears the same number, Q-630, as appears on the receipt and on the application. The certificate reads as follows:

" 'To be issued only when a settlement has been made in accordance with the Company's rules. Interim Assurance Certificate. Issued in consideration of, and in connection with an application to North American Life Assurance Company corresponding in number and date with this Certificate. As a settlement satisfactory to the Company has been made for the first premium under the policy as applied for, the assurance, subject to the terms and conditions of the policy applied for, shall take effect if and when the Company's authorized officers at the Head Office of the Company in Toronto, Canada, shall determine (1) that the Life to be Assured was an insurable risk under their general practice on the date of the medical exam-

ination for the policy or on the date of the declaration of the Life to be Assured in lieu of the medical examination, and (2) that the application is acceptable without amendment for an amount not to exceed that which the Company accepts under its regular rule without reassurance on the plan applied for and at the rate of premium applicable to the assurance applied for. Should the assurance take effect under this certificate, it shall thereupon be deemed to have taken effect as from the date of the medical examination, or declaration in lieu thereof, referred to above. This Certificate is not valid nor binding on the Company unless countersigned by a duly authorized Representative of the Company.'

"We are at once met with several ambiguities in the language of the receipt and of the interim assurance certificate. We must therefore resolve the ambiguities in favor of the plaintiff and against the defendant, which was their author. Western Insurance Co. v. Cropper, 32 Pa. 351 (1859); Hillman Trans. Co. v. Home Insurance Co., 268 Pa. 547 (1920); Stonsz v. Equitable Life Assurance Society, 324 Pa. 97 (1936). The receipt provides, 'Under no circumstances will the company assume any liability until a policy has been delivered and the premium has been settled in full, unless an interim assurance certificate has been issued.' This clause we construe to mean that by the issuance of an interim assurance certificate the company does assume liability. To determine the extent of the company's liability, we must examine the interim certificate.

"By its very title, the certificate is one for interim insurance. During what interim? No other construction is admissible than that the interim in contemplation is the period between the issuance of the certificate and the issuance of the policy or rejection of the

application. Otherwise what consideration would pass to the applicant for the payment of the premium if he were wholly uninsured pending the policy's issuance? Here again we find ambiguity. The interim assurance certificate states in one sentence that the 'assurance . . . shall take effect if and when the Company's authorized officers . . . shall determine' the insurability of the applicant and the acceptability of the application. In the next sentence it recites, 'Should the assurance take effect under this certificate, it shall thereupon be deemed to have taken effect as from the date of the medical examination.' Having determined that the certificate was intended to effect temporary insurance coverage, we can reach no other conclusion than that the applicant was covered from the time of its issuance. The company cannot extend coverage with one hand and withdraw it with the other.

"But the certificate is so worded as to indicate further that the coverage is subject to the condition that the applicant be found by the company's officers to be an insurable risk on the date of the medical examination. This we construe to refer to the applicant's physical condition. There are of course other aspects of insurability, but the testimony of the defendant's witnesses makes it clear that in all respects the applicant was an insurable risk. His habits, his occupation, his family history, his physical condition, all factors of insurability, were satisfactory. The only reason which the defendant advances for which it maintains that it would have disapproved the application if the applicant had lived is that the application was for too large an amount of coverage; with his already existing insurance in other companies, a policy for $211,266 would have rendered McAvoy 'over insured' under the defendant's general practice; and in

any event the company would not have issued a policy for more than $100,000 without reinsurance.

"There was testimony presented by the defendant regarding the company's general practice with respect to the amount of insurance the company would contract for with an applicant of a given age and with a given income. There was also testimony that the general practice of the company is to reinsure with other companies the excess above $100,000 of any policy. It may be that these considerations, had Thomas B. Mc-Avoy, Jr. not died when he did, would have moved the company ultimately to decline to issue the policy which had been applied for; but we cannot escape the conclusion that a contract had been entered into for interim insurance under which the company was bound until it signified its intention to reject the risk. It would have been easy, had no interim coverage been intended, for the defendant's branch manager to issue a deposit receipt only. No question is raised of the branch manager's authority to issue an interim certificate, nor does the defendant question that the certificate constituted a contract. The contract was entered into with knowledge on the part of the company's representative of the amount of insurance being applied for, and with knowledge of the company's general practice in this respect. We must hold that, regardless of the company's right to decline to issue a policy and to terminate its liability by notice of such declination during the applicant's lifetime, a legal and binding contract of insurance existed from the time of the issuance of the interim certificate and was in force on July 3, 1955, when Thomas B. McAvoy, Jr. died.

"The conclusion that we have reached in this case is, we believe, not only based on sound principles of contract law, but is supported by the weight of Pennsyl-

vania authority and the tendency of the courts of other jurisdictions in recent years to resolve questions arising out of temporary insurance contracts in favor of the insured. An exhaustive annotation at 2 A.L.R. 2d 943, following the case of Leube v. Prudential Insurance Co. of America, 147 Ohio St. 450, 72 N.E. 2d 76 (1947), listed Pennsylvania as among the states which in the editor's opinion would probably impose liability on the insurer in such situations as the present. Among the more recent cases dealing with the subject is Ransom v. Penn Mutual Life Insurance Co., 43 Cal. 2d 420, 274 P. 2d 633 (1954). In that case the court, in holding for the plaintiff, stated the problem, similar to the one now before us, in the following language:

" 'We must determine whether a contract of insurance arose immediately upon receipt by defendant of the completed application with the premium payment, subject to the right of defendant to terminate the agreement if it subsequently concluded that Ransom was not acceptable, or whether, as defendant contends, its satisfaction as to Ransom's acceptability for insurance was a condition precedent to the existence of any contract.

" 'The courts in several jurisdictions have construed clauses similar to the one involved here. A number of decisions have held, in accordance with defendant's view, that no contract of insurance exists until the insurer has been satisfied as to an applicant's acceptability, and that the provision that the insurance shall be in force from the date of the application means that, if and when the company is satisfied, the contract shall be considered to relate back and take effect as of that date. (Mofrad v. New York Life Ins. Co., [10th Cir.], 206 F. 2d 491; Cooksey v. Mutual Life Ins. Co., 73 Ark. 117, [83 S.W. 317, 108 Am. St. Rep.

26]; Maddox v. Life & Casualty Ins. Co. of Tenn., 79 Ga. App. 164, [53 S.E. 2d 235]; Gerrib v. Northwestern Mut. Life Ins. Co., 256 Ill. App. 506; Gonsoulin v. Equitable Life Assurance Society, 152 La. 865, [94 So. 424]; Bearup v. Equitable Life Assurance Society of the U. S., 351 Mo. 326, [172 S.W. 2d 942]; Raymond v. National Life Ins. Co., 40 Wyo. 1, [273 P. 667].)

"'On the other hand, a number of courts have held that the provision to the effect that the insurance shall be in force from the date of the application if the premium is paid gives rise to a contract of insurance immediately upon receipt of the application and payment of the premium, and that the proviso that the company shall be satisfied that the insured was acceptable at the date of the application creates only a right to terminate the contract if the company becomes dissatisfied with the risk before a policy is issued. (Gaunt v. John Hancock Mut. Life Ins. Co., 160 F. 2d 599, 601-602; Occidental Life Ins. Co. v. Lame Elk White Horse, [D. C. Mun. Ct.], 74 A. 2d 435, 438-439; Reck v. Prudential Insurance Company of America, 116 N.J.L. 444, [184 A. 777, 778]; Duncan v. John Hancock Mutual Life Insurance Co., 137 Ohio St. 441, [31 N.E. 2d 88, 90-91]; Albers v. Security Mut. Life Insurance Co., 41 S.D. 270, [170 N.W. 159, 160]; see Reynolds v. Northwestern Mutual Life Insurance Co., 189 Iowa 76, [176 N.W. 207, 208-209]; cf. Stonsz v. Equitable Life Assur. Soc., 324 Pa. 97, [187 A. 403, 405-406, 107 A.L.R. 178] [stating that this view represents a trend to construe the conditions liberally]; Western and Southern Life Insurance Co. v. Vale, 213 Ind. 601, [12 N.E. 2d 350, 354-355].)'"

The judgment of the court below is accordingly affirmed.

Mr. Justice BELL dissents.