(April Term, 1938)

## BARBER ET AL. v. SHERIDAN TRUST & SAVINGS BANK ET AL.

(No. 2028; May 10, 1938; 78 Pac. (2d) 1101)

For the appellants, there was a brief and oral argument by *Louis J. O'Marr* of Sheridan, Wyoming.

68

For the respondents there was a brief and oral argument by *H. Glenn Kinsley* and *John G. Hutton* of Sheridan.

70

RINER, Justice.

This proceeding, by direct appeal, asks the review of a record made in a cause tried in the district court of Sheridan County, wherein Florence Wallace Barber and W. H. Wallace were plaintiffs and two banking corporations, Sheridan Trust and Savings Bank and the Bank of Commerce, together with A. J. Ham, John J. Bentley and J. E. Lee were defendants. Lee having subsequently died, J. T. Kessinger was substituted in his stead as a party defendant. However, as it subsequently developed that he had nothing to do with the transactions involved in this litigation, the court, in the course of the trial, dismissed him from the case. The evidence of the parties was submitted to the court, with a jury in attendance, and resulted in a verdict for the plaintiff, upon which a judgment was in due course rendered against all the defendants who have united in this appeal.

The first four paragraphs of plaintiff's petition, in substance, alleged that Florence Wallace Barber resides in Utah and W. H. Wallace in Sheridan County, Wyoming; that the defendants Lee, Ham and Bentley composed a "shareholders committee" of the banking corporation Sheridan Trust and Savings Bank, which is alleged to be in the process of liquidation, its assets being in their hands, subject to certain security rights of the Bank of Commerce of Sheridan, Wyoming, in some or all of such assets; that said last mentioned bank has and claims some interest in the promissory note given by plaintiffs, as hereinafter described; that the plaintiffs at the times mentioned in said pleading were joint owners of a certificate for seventy shares of the capital stock of Sheridan Artificial Ice Company, a Wyoming corporation; that on December 19, 1932, plaintiffs executed and delivered to the defendant, Sheridan Trust and Savings Bank, their promissory note for $1600.00, depositing with said bank as collateral security therefor the aforesaid stock certificate, which was of the par value of $50.00 per share; and that said note and collateral security agreement provided that said certificate was pledged, a copy of the note and collateral agreement being attached to and made a part of the petition as Exhibit A.

This note was made payable to the Sheridan Trust and Savings Bank on August 26, 1933, bore interest at eight per centum per annum, from February 26, 1933, until due and ten per centum per annum thereafter. The collateral agreement attached thereto, signed by the plaintiffs, provided among other things that upon non-payment of the note at maturity or of the interest thereon when due the "said Bank, or its assigns, is hereby given full power and authority to sell, transfer and assign, free from any right of redemption, the whole, or any part, of said property, or substitutes therefor, or additions thereto, if any, either

at public or private sale, without demand or notice or advertisement, which are hereby expressly waived, and said Bank, or its assigns, may purchase at such sale. And upon such sale the said Bank, or its assigns, shall deduct from the proceeds all fees, costs and expenses thereof, and apply the residue to the payment of this note, or of any liability or liabilities of the undersigned, at the option of the said Bank, or its assigns, and shall turn over the surplus, if any, to the undersigned; but in case of any deficiency the undersigned shall be jointly and severally liable therefor."

The remaining paragraphs of said petition charged, to summarize them briefly: Paragraph 5, that on or about October 9, 1935, the defendants wrongfully converted said shares of stock to their own use and sold same to F. S. Robinson of Sheridan, Wyoming, for $2,003.56, the amount then claimed by defendants to be due as principal and interest on said note; Paragraph 6, that on said date Robinson was negotiating for the puchase of all of the stock of said Sheridan Artificial Ice Company, except such as was then held by him and his family, and in order to carry out his negotiations, was "under the necessity of purchasing all of it;" that Robinson did purchase all of said stock on or about the date aforesaid, paying for all of it, except plaintiff's, its full par value, and, in one instance, more than its full par value, all of which the defendants knew and, "by the exercise of ordinary care and prudence, could, should and would have been known," to them; Paragraph 7, that in disregard of plaintiffs' equities in said stock, defendants' trust obligations, and the law of pledges applicable to Exhibit A aforesaid, the defendants wrongfully converted and sacrificed said stock for $2,003.56; Paragraph 8, that said stock, on or about October 9, 1935, was reasonably worth and readily salable for its par value of $3,500.00; Paragraph 9, that on said date

plaintiffs were indebted to the banks aforesaid in a total amount of $2,003.56; that the defendants' wrongful acts, as above alleged, have damaged the plaintiffs to the extent of $1,496.44, the difference between the value of the stock thus converted by defendants and the amount due from plaintiffs on the note aforesaid on said date, plus interest at seven per centum per annum therefrom; Paragraph 10, that said note and collateral agreement have never been surrendered to plaintiffs though they are entitled thereto and to the cancellation thereof. A judgment was prayed in the sum of $1,496.44, with interest thereon against said defendants, and, also, an order for the surrender of said note and agreement to the plaintiffs by the said defendants.

The amended separate answer of the defendant Bank of Commerce admits that it sold to Robinson the stock mentioned in plaintiffs' petition for $2,003.56, the amount due the Sheridan Trust and Savings Bank, but that in selling said stock it acted solely for the bank last named and at the direction of and under the intructions of the shareholders committee of that bank. Other allegations of Paragraph 5 of said petition were denied, as were, also, all those contained in Paragraphs 6 and 7 of plaintiffs' petition. As to Paragraph 8, it was denied that the stock aforesaid was reasonably worth and readily salable for $3,500.00, but it was alleged that it was not worth nor salable for more than $2,003.56. Regarding Paragraphs 9 and 10, the indebtedness of plaintiffs to the Sheridan Trust and Savings Bank was admitted, but all other allegations of Paragraph 9 were denied, as were the allegations of Paragraph 10 relative to the amount of damages claimed.

The Sheridan Trust and Savings Bank also filed an amended separate answer to plaintiffs' petition, wherein it admits it caused said stock to be sold to Robinson

for the amount stated in Paragraph 5 of plaintiffs' petition. The remaining portion of this answer is quite similar to that of the Bank of Commerce outlined above, except as to Paragraph 10 of the petition, it admits that plaintiffs are entitled to a cancellation and surrender of their promissory note aforesaid.

Bentley and Ham joined in an amended answer to plaintiffs' pleading, which is practically the same as that of the Sheridan Trust and Savings Bank. Replies were subsequently filed by plaintiffs, putting in issue the affirmative allegations of the several answers.

The jury's verdict was for the full amount claimed by plaintiffs, and judgment was rendered against both banks, as well as against Bentley and Ham individually, and all of these defendants joined in the notice of appeal from said judgment filed in the cause. The specifications of error accompanying the record on appeal, prepared on behalf of the defendants, appear to be both joint and several in character.

In this connection it may be of interest to note that Robinson, as a witness on behalf of the plaintiffs, stated that on the 9th day of October, 1935, he did not purchase any of the stock of the Sheridan Artificial Ice Company from the Bank of Commerce; that he had no dealings on that date with that bank, except that the stock was delivered to him by its cashier, Mr. Guy Sturgeon; that he purchased for $2,003.56 the Wallace and Barber stock on that date from Mr. Ham and Mr. Lee, members of the stockholders liquidating committee of the Sheridan Trust and Savings Bank; that the only dealings Robinson had with the cashier aforesaid, was to ask him if he had gotten authority to turn the stock over to Robinson which he did on the last named date. This testimony seems not to be disputed by any one. The cashier aforesaid, testifying for the defendants regarding the transaction, said simply that Lee of the shareholders committee, on

September 30, 1935, gave him instructions to sell the stock to Robinson for the amount of the note plus interest; that he consummated the sale on October 9, 1935, by receiving $2,003.56 for the stock from Robinson and delivering the seventy shares of stock to him; that he then placed the money in the trust account of the Sheridan Trust and Savings Bank and mailed the note to Lee as a member of the shareholders committee.

The record discloses additionally the following facts which are necessary to be stated to obtain an understanding of the questions arising upon the record presented: When the promissory note of the plaintiffs, as described in plaintiffs' petition, matured on August 26, 1933, it was not paid by them. Thereafter nothing was paid by any one on account of the principal or accrued interest of said indebtedness from that date until the stock pledged as security was sold, as related by Robinson and Sturgeon and above set forth. During the year 1933 and until December 29, 1934, the defendant Ham was cashier of the Sheridan Trust and Savings Bank, and made many efforts to collect the amount due on this note, but without result. In the course of his testimony given on the trial, he stated that Mr. Wallace came into the bank many times saying that he hoped to find some one else to take over the loan; that he suggested to Wallace it might be well to sell the stock and pay the bank off, but evidently Wallace was unsuccessful in negotiating a sale because the bank did not get its money; that he told Wallace many times that the bank was going to sell the collateral; that in the fall of 1933 and also during the year 1934, Ham talked to Mr. Dodds, at that time the largest individual stockholder of the Sheridan Artificial Ice Company, a man of considerable means and president of said company, about buying this stock for the amount of the note, but failed to get him as an individual to purchase it; that Ham then spoke to

Dodds and to Robinson as officials of the company, suggesting that probably the Ice Company would buy the stock in order to take it from the bank, but this effort was without success; that in the fall of 1933 and 1934 Ham had made a proposition to Robinson himself to sell the collateral stock to the latter, for the amount of principal and interest due on the note, but that Robinson declined to buy it on those occasions; and that he (Ham) would have granted Wallace the right to sell the stock if the latter had asked for it. The plaintiff Wallace, in the course of his testimony on cross-examination, said that he had attempted to borrow money on the stock in question to take up the indebtedness, but was unsuccessful; that he tried to turn the stock back to the Ice Company, with his note and the stock as collateral, they to take it up, and that this deal would have gone through, but Robinson objected; that before September, 1935, he told Robinson that if he found a chance to sell the stock so that Wallace could take up this indebtedness at the Bank, Wallace would be glad of it and would pay Robinson a small commission.

On December 29, 1934, the Sheridan Trust and Savings Bank ceased to function as a going banking concern and J. E. Lee, John J. Bentley and A. J. Ham were named as a stockholders liquidating committee. On that date all of the assets of said bank were assigned to the Bank of Commerce, said assets being separated into two classifications, those acceptable to the Bank of Commerce, which were designated as Class "A" securities, and all the balance as Class "B" securities. The plaintiffs' note, with its collateral, was listed among those in Class "B". The agreement under which the matter was handled provided, according to the stipulation submitted to the court by the parties, that for a period of two years, terminating December 29, 1936, the shareholders committee should have the right

"to cooperate" with the Bank of Commerce in the collection of said Class "B" assets; the fund derived from such assets was to be held as a trust fund by the Bank of Commerce for the shareholders committee, the bank last mentioned having the right to draw upon this fund to replace any determined unsatisfactory Class "A" assets during said two year period.

About the middle of September, 1935, Mr. Ham of the shareholders liquidating committee referred to, was in the city of Sheridan, Wyoming, and there met Robinson, who inquired, "Does your bank still own the Wallace note and collateral?" Ham answered that it did. Whereupon Robinson additionally inquired, "Is your former willingness to sell that to me still available?" To this Ham responded in the affirmative and told Robinson that, "We were very anxious to dispose" of the stock, saying, also, that he was leaving town and that he would communicate Robinson's "deal" to the members of the shareholders committee. This he did by phoning Bentley and telling him to advise Lee, which was also done. The matter was then apparently handled by the other members of the committee, as Ham left Sheridan the next morning.

On September 26 or 27, 1935, Wallace received by mail a letter written on the letterhead of the Bank of Commerce, dated September 19, 1935, addressed to him and signed by Guy Sturgeon as cashier, said letter reading:

"Among the assets of the Sheridan Trust & Savings Bank, which bank we purchased, we find a note executed by you and Florence Wallace Barber dated Dec. 19, 1932, due Aug. 26, 1933, in the amount of $1600.00 with interest at the rate of 8%. This note is secured by certificate No. 38 for 70 shares of Sheridan Artificial Ice Company.

"This note is now long past due and no interest has been paid upon same and undoubtedly we will be requested by the shareholders committee of the Sheridan

Trust & Savings Bank to realize on this indebtedness by liquidation of the stock securing same. Prior to taking such action, which will be mandatory on our part under the Trust Agreement, we believe it courtesy to notify you regarding the condition of this note as undoubtedly you may wish to call and discuss this matter with us. Of course, we will expect immediate attention."

Immediately thereafter Wallace went to the Bank of Commerce and had an interview with Mr. Sturgeon. Wallace's testimony on the trial, in his own behalf, details what occurred as follows:

"I stated to Mr. Sturgeon that I had been informed by Mr. Dodds, President of the Sheridan Artificial Ice Company, that there was a deal on for the sale of all this stock. I informed him, Mr. Dodds had informed me that all the stock was to be sold at one price, or par. I discussed at that time with Mr. Sturgeon my daughter's equity in the stock, told him how she advanced the money to pay this insurance premium, and that I had assigned the stock to her in order to protect her interests as against this advance she had made me. We discussed the matter briefly, and Mr. Sturgeon informed me that he would hold this matter in abeyance—while it was in the hands of the Stockholders Committee, he would hold it in abeyance pending the outcome of this purchase by Mr. Robinson, of which Mr. Dodds had informed me. I then left the bank feeling I had done a great deal of business with Mr. Sturgeon and the Bank of Commerce. I had absolute faith in what he said, absolute faith and confidence, and I left the bank feeling nothing further would be done, and it would give me time in case the deal did go through with Mr. Robinson for the stock and our equity in the 70 shares of stock would be protected."

Wallace also testified that on September 30, 1935, he talked with Mr. Dodds, mentioned above, at which time the latter told Wallace that he (Dodds) had signed an option and Mr. Nels Pearson had signed an option and given it to Robinson for the sale of their

interest in the Ice Company; that between the time Wallace saw Sturgeon and the 30th of September, 1935, he made one effort to see Robinson, but was unable to do so as the latter was out of town; and that either on September 30 or October 1, 1935, he left Sheridan on the business of his employer, the Holly Sugar Corporation, and did not return until October 11, 1935.

Under date of September 30, 1935, Sturgeon, as cashier of the Bank of Commerce, sent another letter through the mail addressed to Wallace at Sheridan, Wyoming, reading:

"In reference to your $1600.00 note to the Sheridan Trust & Savings Bank.

"I have been instructed by the shareholders committee today to advise you that they will give you a period of three days for the purpose of paying this indebtedness in full and securing the return of your collateral consisting of 70 shares of Sheridan Artificial Ice Company.

"I find I wrote to you on Sept. 19th regarding this matter and stated that we anticipated some action would be taking place regarding this loan and we have no further course to pursue but to abide by the instructions given to us by the Sheridan Trust & Savings Bank shareholders committee. Therefore, if any action is not taken by the close of business on Thursday, Oct. 3rd. we will turn the matter over to the shareholders committee on their demand, which we must comply with."

This letter was received at the home of Wallace shortly after September 30th. His daughter immediately called Sturgeon, who said he would see what he could do about it when told that Wallace was out of town and that she did not know how to get hold of him. The daughter testified, also, that her father left no address when he departed on the business trip and though she thought her mother endeavored to reach him, it could not be done.

On October 9, 1935, the stock was in fact sold as

stated by Robinson and Sturgeon, as hereinabove described. Prior to that date Robinson was serving as secretary and treasurer of the Sheridan Artificial Ice Company and owned some of the stock thereof. The Ice Company had an outstanding capital stock of 406 shares of the par value of $50.00 per share, and on the date of the sale aforesaid, Robinson, in addition to acquiring the Wallace stock, also purchased the balance of the corporation's outstanding stock not held by him, being that owned by five other persons, four of whom he paid the par value of said stock, and one of them was paid by him $10.00 more than par.

Robinson, as a witness for the plaintiffs, gave testimony that it was his plan to acquire all the stock of the Ice Company; that he was the only person in the market to buy the stock so far as he knew; and the following questions and answers asked and answered by him appear in the record:

"Q   Would you have, under any circumstances, paid any more than you did pay for it at that time?
A   No, sir.
Q   And you were the only person purchasing that stock on that day, weren't you?
A   Yes, sir."

And, also,

"Q   The fact of the matter is, you bought it at the price you paid for it because you could get it at that price?
A   I had been offered the stock at that price, yes, sir.
Q   By the Committee?
A   Yes, sir.
Q   And that is the reason you didn't pay more for it?
A   No, because in the first place, I wouldn't have been able to pay more for it."

There was no evidence that any other market existed for the stock at the time it was sold, or any other time.

Ham, Bentley and Sturgeon all denied that they knew at the time the sale was made of the Wallace and Barber stock that the other stock of the Ice Company was being purchased at par or more by Robinson. They, however, admitted that after they learned of Robinson's desire to buy it, they did not inquire of Robinson, or any one else, to ascertain whether other stock of the Ice Company was being sold or what it was being sold for. Robinson testified that he did not tell them and was not asked about it. After the stock had been sold, Wallace says in his testimony that he had an interview with Sturgeon and informed him that he felt that the plaintiffs' stock had been sold for much less than all the balance of the stock bought, and that they had a certain equity there to which they were entitled, and that Sturgeon replied: "Well, Bill, I thought myself it was a shame at the time that your stock had to sell at the price it did when the other stock was bringing par."

Recurring to plaintiffs' petition, as outlined above, it is apparent that while undertaking to allege a conversion by the defendants of the seventy shares of stock of the Sheridan Artificial Ice Company pledged by plaintiffs and so stating in general terms, the specific facts alleged in the pleading do not show that the sale made of the stock on October 9, 1935, was an unauthorized one and consequently a conversion of said stock, but on the contrary merely set forth a sale at an inadequate price due to asserted negligence on the part of the defendants. It is familar law that where both general and specific allegations are made regarding the same subject matter, the particular averments must control and the merit of the case must be tested by them. 49 C. J. 119, Sec. 111, and cases cited; S. H. Pope & Co. v. Union Warehouse Co., 195 Ala. 309, 70 So. 159; Kendall v. City of Duluth, 64 Minn. 295, 66 N. W. 1150; Richardson v. Busch, 198

Mo. 174, 95 S. W. 894; De la Vergne v. Richardson, 198 Mo. 189, 95 S. W. 898; Bank of Little Rock v. Fisher, 55 Mo. App. 51. Yet both instructions numbered 5 and 6, given to the jury for their guidance, appear to proceed on the theory that whether or not there was a conversion of plaintiffs' stock was one of the issues in the case to be determined by that body. Both of these instructions required the jury to find what was the fair value of the stock, and, when so found, determine whether the defendants sold it for less than such value, they being liable for the difference. These instructions were duly excepted to, assigned and argued as error by appellants.

In Southern Exchange Bank v. Langston, 33 Ga. App. 477, 127 S. E. 230, a case which seems to us closely in point in the matter at bar, it appeared that the bank brought an action on a note given it by the defendant, which was secured by pledged corporate stock and which had been sold by the bank in an effort to realize its claim. The defendant filed a plea in recoupment, wherein it was set up that it was "Incumbent upon the plaintiff to act in good faith to the extent of obtaining the market value" of the stock thus sold; that the plaintiff was indebted to the defendant "on account of its failure to obtain the market value of the same at the time of the sale as represented in the difference of $60 and $150 per share," this being a difference on the 47 shares sold of $4250; that "had the plaintiff obtained on the sale of said stock its market value, as it was legally and morally bound to do, said market value * * * would have exceeded plaintiff's present demand in the sum of $3459.36," and the defendant made claim for this difference. This plea was amended charging that "the plaintiff converted said stock by selling same at less than the market value, having taken over and converted to their own use at a valuation of $60 per share, when in fact said

stock at the time of taking over was worth $150 per share."

With the pleadings in this situation, so far as the defendant was concerned, the case came to trial, and the court instructed the jury in effect that the sole issue was whether the plaintiff was "indebted to the defendant, the difference between the fair market value of said stock and what the stock was actually sold for by the plaintiff;" that it was the duty of the plaintiff to sell the stock fairly and at a fair market price, and, if the plaintiff knowingly sold the stock at a price less than the market price, then the defendant would be entitled to recover from the plaintiff the difference between the fair market price and what the stock actually brought;" and that the defendant should recover if the jury should find "that the bank sold this stock for less than the market price" if "the fair market price was greater than the amount of debt due the plaintiff by the defendant." The jury returned a verdict for the defendant for principal and interest amounting to $1596.99.

It was held on error that a verdict for the plaintiff was required by the evidence so far as the claim of conversion of the stock was concerned; that unless, on retrial, the defendants plea was amended to charge want of ordinary care on the part of the plaintiff in failing to obtain the alleged value of the stock on the date of sale, and the evidence as to any actual conversion should again be absent, the defendant's right of recoupment would fail. The court remarked in the course of its opinion:

"Where property is easily and readily salable on the open market at a definite, well-known, or ascertainable market value, the mere failure of the pledgee in a private sale to sell at such value might of itself amount, not only to a failure of the ordinary and reasonable skill and diligence which is required of him by law,

but also, where the facts are plain, amount to such a lack of good faith as would amount to fraud and a conversion of the property. But, where the pledged property consists merely of stock in a private corporation, not readily salable on the open market and without a real and definite market value fixed by public demand and actual sales, but having only a theoretical market value, based on estimates of the book value of the stock and on two or three scattered and isolated sales made by stockholders before and after the day of sale by the pledgee, the mere failure of the pledgee to obtain such theoretical and opinionative market value will not of itself establish fraud and conversion. Palmour v. Roper, 119 Ga. 10 (5), 19, 45 S. E. 790; 19 R. C. L. 614, Section 431 * * *

"But in the event of an amendment of the plea as just indicated, the proper measure of damages, where there has been no conversion but merely a failure to obtain at a private sale a fair and proper price for corporate stock held as collateral, by reason of a failure to exercise ordinary and reasonable skill and diligence, is not the difference between the price obtained and the theoretical intrinsic or opinionative market value based only on calculations and opinion as to the book value of the assets and liabilities and on two or three isolated sales prior to and subsequent to the date of transaction, but is only the difference between the amount obtained and such value as the jury may find could and should have been obtained by the pledgee had it exercised ordinary and reasonable skill and diligence in making the sale. This may or may not be the theoretical market value. The plea as now amended, in so far as it seeks to allege a conversion merely by failing to obtain the alleged market value of the stock, failed to state a legal defense; and the charge of the court upon that line, as above indicated, was erroneous. While there was evidence on both sides as to what the stock should have brought and as to the care and diligence exercised in making the private sale, there was no evidence of actual conversion of the stock to the pledgee's own use."

And the judgment in favor of the defendant was reversed.

In Buder v. New York Trust Company, 82 Fed. (2d) 168, 104 A. L. R. 1035, the United States Court of Appeals for the Second Circuit, in reversing a judgment below, for the plaintiff, in an action for damages for the alleged conversion of pledged stock, held that a sale made by a pledgee under an option which was revocable by it could not be a conversion of the pledged property since the pledgee's discretion as to price would not be limited by such an option, and in the course of its discussion of the point the court said:

"If the option was not binding, it was no more than an offer to sell; an offer which did not limit the pledgee's discretion as to price since he was legally privileged to withdraw if before acceptance. The making of a revocable offer cannot be a conversion, nor can the sale effected by its acceptance. *If the property was sold at an inadequate price, the pledgee might be called to account, but not for a conversion.*" (Italics inserted.)

We are inclined to think that the rules announced by the foregoing authorities,—and those dealing with the precise point involved are not numerous,—are sound, and that in consequence there was, as the record at present stands, neither pleading nor proof of a conversion of plaintiffs' stock by what was done on the part of the defendants. The real claim of plaintiffs appears to be based on an asserted lack of ordinary care and lack of due diligence in obtaining from Robinson a sale at least the price for which he purchased the other stock of the Sheridan Artificial Ice Company, viz., par or more.

It may be observed that the allegations of want of ordinary care on the part of the defendants, as set out in plaintiffs' petition, are not, in so many words, directed at the making of the sale by the defendants, but with reference to their failure to obtain knowledge of Robinson's plan and his proposed purchase of stock. As a matter of fact, of course, he did not actually

purchase any stock at all until October 9, 1935, as we have seen. He merely held options to purchase, and whether they were revocable or not does not appear, except that it would seem that the arrangement made between him and the shareholders committee, if it be so regarded, was of a revocable character. However, we think that it may fairly be inferred that the pleading of want of diligence and lack of ordinary care in making the sale of plaintiffs' stock, as it was made, is averred.

Something is said and authorities are cited in respondents' behalf that there was a waiver of the power of private sale by Sturgeon, on account of the conversation had by him with Wallace on September 26 or 27, 1935, but no intimation of such a claim appears in plaintiffs' petition asserting that the sale was unauthorized for that reason. "Waiver," which would seem to be a very flexible and not always definite term, has been defined as the "voluntary relinquishment of a known right." It is affirmative matter and as a rule should be pleaded. Harrington v. Fedderson, 208 Iowa 564, 226 N. W. 110. No issues relating to such a question were apparently litigated by the parties or submitted to the jury under appropriate instructions. Further, even if Sturgeon's statement to Wallace on their first interview, referred to above, that he would hold the matter "in abeyance," while it was in the hands of the stockholders committee, "pending the outcome of this purchase by Robinson," could be regarded as a waiver of the power to sell, the authority vested in Sturgeon to make such a promise is not altogether free from doubt inasmuch as the letter from Sturgeon to Wallace under the date of September 19, 1935, introduced in evidence by the plaintiffs, expressly states that it would be "mandatory" on the part of the Bank of Commerce to sell the stock in question if the shareholders committee of the Sheridan Trust and Savings

Bank so requested. Wallace had received this letter just before his interview with Sturgeon and had been warned. Substantially the same statement appears in the Sturgeon letter of September 30th, though, of course, Wallace did not receive that communication before the sale was made.

The district court declined to give Instruction No. 4, asked for by the defendants, and to this refusal an exception was saved, error assigned and argued here. That instruction reads:

"If you find from all the evidence in this case that F. S. Robinson was the only person purchasing the Sheridan Artificial Ice Company stock on October 9, 1935, and that he would not have paid more than $2,003.56 for the 70 shares of the capital stock of said Company which he purchased from the defendants on that day, your verdict must be for the defendants."

We think that under the authorities referred to above the instruction should have been given. From what has been said, it is plain that there was evidence that Robinson would not have paid more than the amount stated in the instruction, and there was also evidence from which the jury might infer that the defendants had not been sufficiently diligent and careful to obtain from Robinson the same bargain he gave the other stockholders. The question, therefore, was whether Robinson would have bought the stock pledged by plaintiffs at a higher price than he did had the defendants exercised ordinary care and diligence in handling the sale. This was the crucial question for the jury to determine, and as we view the record before us, indeed, practically the only question which really required solution by the jury.

There is certainly no evidence, or no reason to believe, that any one except Robinson would have bought this stock at all. No instruction was given covering the point embodied in Instruction No. 4 afore-

said. We are not inclined to think, under the circumstances shown, that any instruction on market value of the stock was required, as claimed by the defendants. The question presented was not one of market value at all. There was no market value for the stock. The situation presented was simply that of one man buying up all the stock in the Ice Company, and, in consequence, the question of what he would or would not have done under proper diligence and ordinary care on the part of the defendants in selling to him. The only purpose subserved by the evidence in regard to the actual value of the stock would appear to be to furnish a setting of the transaction from which the jury might be aided in determining whether Robinson would have paid the defendants more for the stock than he did if proper diligence had been exercised in disposing of it. The measure of damages which plaintiffs could claim would, therefore, seem to be the difference between what the stock was actually sold for by the defendants and what the jury believed Robinson would have paid for it had the defendants made the necessary effort to obtain the highest price he was willing to pay.

It is urged on the respondent's behalf that Instruction No. 4 said nothing about the legal requirement that defendants were bound to use reasonable skill and diligence in disposing of plaintiffs' collateral. But that point was covered by instructions given by the court. There was no need to incorporate the same direction repeatedly. All the instructions were, as the jury were in fact told, required to be considered together. It is urged, also, that this instruction ignored other evidence which indicated that Robinson would not pay more merely because he had been promised the stock by the shareholders committee at the price he paid. But that evidence presents the plaintiffs' theory in the matter. Both parties were entitled to proper instructions covering their respective theories regarding the

evidence submitted, and, it was, of course, for the jury then to determine the issue.

Other points have been argued, but as they will probably not arise on a retrial of the case, we have deemed it unnecessary to extend this opinion by consideration of them. Sufficient has been said to indicate that, as we think, justice to all parties concerned requires a clarification of the issues herein involved and that the cause should be retried. The judgment is accordingly reversed with instructions to the district court of Sheridan County to grant a new trial.

*Reversed with instructions.*

KIMBALL, Justice, and TIDBALL, District Judge, concur.