# MONTGOMERY WARD & CO. v. ARBOGAST ET UX.

(No. 2056; August 2, 1938; 81 Pac. (2d) 885)

For the plaintiff in error, there was a brief by *H. B.*

*Durham, C. M. Crowell* and *Wm. B. Cobb* of Casper, and oral argument by *Wm. B. Cobb.*

For the defendant in error, there was a brief by *E. E. Enterline, Madge Enterline* and *W. J. Wehrli* of Casper, and oral argument by *E. E. Enterline* and *W. J. Wehrli.*

RINER, Justice.

This is a proceeding in error to review a judgment entered upon the verdict of a jury in a cause wherein C. P. Arbogast and Laura B. Arbogast were plaintiffs and Montgomery Ward and Co., a corporation, and F. W. Redman were defendants in the district court of Natrona County. The verdict aforesaid was rendered against the defendant corporation only and it alone has prosecuted this proceeding for review. Hereinafter the plaintiff in error will usually be referred to as the "Company" and the defendants in error as the "plaintiffs" or by their respective names.

The action below was one brought by the plaintiffs for alleged negligence on the part of the above named defendants in installing a hot air coal furnace in the basement of a building located about eleven miles from the City of Casper, Wyoming, and owned by the plaintiffs, wherein they conducted an inn and a retail liquor business. The plaintiffs also occupied this building as their home. It is asserted that this alleged negligence caused a fire on the evening of December 25, 1935, which destroyed the building and much of its contents. The furnace was purchased from the Company the latter part of October, 1935, under a time payment contract and an alleged agreement on the part of said Company to install same in the basement of said building used by plaintiffs as above described. The sale of the furnace to the plaintiffs was made on the Company's behalf by the defendant F. W. Redman, who is a salesman in its employ and in charge of the plumbing and heating department in the Company's local store engaged in business at Casper, Wyoming.

It is alleged in plaintiffs' petition and denied by the

defendants' answer that Redman had "full power and authority" to "install hot air furnaces whenever the same were sold and delivered to any purchaser" by said Company. The actual work of installing the furnace was done by one G. L. Welch with the assistance of his son, Clair D. Welch. Accordingly, whether they were the agents of the Company in performing this task appears to be the principal question argued by the parties here, the Company insisting that there is insufficient evidence in the record to establish that Redman had authority to employ Welch and his son to install the furnace in question or that they were in fact engaged by the Company to do so. The position of the plaintiffs appear to be that there is "circumstantial evidence" which when considered "in connection with other evidence" was sufficient to carry the question of agency or non-agency to bind the Company in the installation of the furnace as one of fact to the jury for its decision. It becomes necessary, therefore, to examine somewhat in detail the evidence submitted on the trial of the case in so far as it deals with these questions.

The record discloses that Laura B. Arbogast, one of the plaintiffs and the wife of C. P. Arbogast, at his request, some time in October, 1935, made an inquiry at the Company's store in Casper, relative to the purchase of a furnace for heating an addition to the building owned by them as aforesaid, which was then in the course of construction. In response to this inquiry, some days later, Redman came to plaintiffs' inn, and after showing him the rooms to be heated, Arbogast took him to the basement where the furnace was to be installed. The latter measured the rooms where the runs or pipes from the furnace were to be placed and also made a penciled sketch thereof. The two men then came upstairs to the bar room, where Mrs. Arbo-

gast was, and according to her husband's testimony the following conversation took place:

"I said, 'Mr. Redman, figure out the cost of your largest furnace complete.' Mr. Redman figured a little there on the bar, and he turned to me and says, 'Well, Mr. Arbogast, our twenty six inch furnace will cost you $145.00 complete.' He says, 'Now, the installation, do you want that added on your contract or not?' And I says, 'Of course I want you to install this furnace.' 'Oh', he says, 'Sure, we install it, but how do you want to pay, put that on your contract or do you want to pay them when it is done?' "

Arbogast thereupon asked Mr. Redman how much the installation would be and the latter stated it would be $20.00. Arbogast then turned to his wife and, as his testimony reads verbatim, "I says, 'I think we can pay the $20.00 when they do the job, don't you, Laura?' And she says, 'Well, I guess we can.' "

Mrs. Arbogast's testimony concerning this conversation was: When her husband asked Redman what the furnace would cost the latter said, " 'This will cost $145.00. Now what do you want to do about the installation, do you want us to put that on the contract, or are you going to pay for it when it is done?' My husband said, 'I want you to install it.' He said, 'Oh yes, of course I know you want us to install it, but how do you want to pay for it, do you want it to go in the contract?' My husband said, 'Well, I don't know, how much would it be?' And he said, 'Well, it would be $20.00.' So Mr. Arbogast turned to me, he said, 'I believe we could pay that now, couldn't we?' And I said, 'Why, I imagine we could.' " It appears by the record that the Arbogasts had carried a time payment account with the Company's Casper store for several years previously.

Redman, as a witness for the defendants, relating his recollection of this conversation stated that he told

the Arbogasts that he would have to refigure the price after he got back to the store, but it would be very close to the figure given them; that "I believe I quoted him about $150.00 on the furnace, and the plumbing I don't exactly, I believe about $200.00. I asked him if he wanted to pay cash for it or add it to his time payment account, and he said he wanted to add it to his account. He wanted to know if we would install it, and I told him that we had no authority, but I knew we would be glad to do everything we could to get him a good competent man to do the work for him. I told him that in some stores we had to have authority to have the labor charges put on the contract, and I asked him if he wanted to have the labor charges on the contract. And he inquired how much it would cost him, and I told him in my experience it should run from $20.00 to $30.00 for a furnace of that size. I hadn't been out here very long, but where I came from that was about what the contractors had charged for installing furnaces; in other words it would run about $4.00 to $8.00 per run for installing the furnace"; that he did not at that conversation or at all agree to install the furnace, but that as an accommodation he would try to get some one who would install it.

Under date of October 23, 1935, a written time payment sales contract was signed in the Company's Casper store for the furnace aforesaid and also certain plumbing fixtures, the purchase of which had been discussed by Redman and Mr. and Mrs. Arbogast at the time the conversation detailed above occurred. The total bill for all of the merchandise thus purchased amounted to $419.29, of which $145.00 was fixed as the price of the furnace and its fittings. This contract was executed by Mrs. Arbogast, who signed her husband's name as the buyer of this merchandise, and was accepted through the signature of D. L. Miller, who was the Company's store manager at Casper. While

this contract was made out by Redman, it was not signed by him on behalf of the Company. Mrs. Arbogast, after it had been drawn up by Redman, was then taken by him to the store's office and left there, where the signatures as described above were affixed. Redman did not see her sign the contract. Nothing appears on the written contract relative to the matter of installation of the furnace.

All of the merchandise thus purchased, with the exception of the furnace, was delivered to the Arbogasts at their inn on the date last above mentioned by one Dotson, who served as delivery man for the Company. The furnace itself appears to have been delivered to them somewhat later. At the time of Redman's conversation with Arbogast and wife the record establishes that he did not know of any one who installed furnaces. However, it seems he did know of a workman who installed plumbing fixtures, and so at that time gave the name of the workman, a man by the name of Farrar, to the Arbogasts, who themselves subsequently employed the person thus mentioned to put in the plumbing material purchased as already described. Redman thereafter made several efforts to find some one who did furnace installation work. Finally he inquired of one Stinson, a salesman in the Company's employ who was engaged in the business of procuring orders on a commission basis for radios, refrigerators and other merchandise, if he knew of any one who was capable of putting in a furnace. Stinson said he did. Subsequently Stinson talked with Clair Welch, the son of G. L. Welch, outside the Company's store, and then conversed with both father and son, telling them, as Stinson testified for the plaintiffs, to go to Redman "and then from there on, why, they may get the job of installing the furnace." Clair Welch, as defendants' witness, stated that Stinson picked him up on the road home, and while they were

driving Stinson told him about the job and asked if his father did that kind of work, and was told he did, so Stinson "stopped in and told him (G. L. Welch) where he could find the job." Clair Welch knew the Arbogasts, and that evening the father and son went out to the Arbogasts' inn.

Redman's testimony, as defendant's witness, is that he did not talk with the Welchs about the job before they went out to see Mr. and Mrs. Arbogast; that he did not at any time deliver a sketch or memorandum of any kind to Mr. Welch. In this connection Mr. G. L. Welch, as a witness for the defendants, testified that he made a sketch on the job of the pipe work to be done, as he usually did for work of this character; that he had no sketches or drawings with him at the time he arrived at the inn. Redman testified, also, that Welch came in and told Redman that he "was going out the following morning to install the furnace, or that morning."

Mr. Arbogast additionally testified that Welch and his son came out to the inn during the evening and before the furnace arrived; that he took them down to the basement where the furnace was to be set, and that "nothing was done until they had a sketch in their hand and they were looking at it"; that he "left them in the basement"; that when the furnace was delivered by Dotson that evening he asked the carpenter to help them unload it and told them they had better put it in the basement; that from then on he had nothing to do with the installation of the furnace and did not direct the Welchs as to its installation; that these men worked at the job four or five days and that he paid them the sum of $20.00; that the first day he gave them in cash $10.00, $5.00 the second day, and $5.00 the third day; that they finished the work the fourth day; that maybe they took one more day; that Redman was not out at the inn at any time during the installation

of the furnace or at any time afterwards; that he (Arbogast) never employed Welch and his son to install the furnace.

Mrs. Arbogast also testified that she went to the Company's store after the fire occurred and made two payments on their account with the Company for the merchandise aforesaid, each payment being in the amount of $50.00. The Company's bookkeeper gave testimony to the effect that the books showed that one of these payments was made on December 31, 1935, and the other on February 17, 1936. The bookkeeper also testified that Mrs. Arbogast said they intended to pay the account as agreed, but that in fact nothing was paid since the date last above mentioned.

There was testimony in the record that Clair Welch had some five months before worked for Montgomery Ward as a clerk on the extra list; that the father, G. L. Welch, had worked a couple of days putting some fixtures in the Company's store at Casper sometime before the furnace was installed, and that he and the son both worked for the Company in the spring of 1936 after the fire occurred. It is not clear at what work they were engaged except that it was not in the work of installing furnaces. Mr. and Mrs. Arbogast both stated that they did not know the Welchs and had never seen them before the evening they came to the inn.

Redman further testified that the local store of the Company at Casper never got authority to install the furnace in question from the Chicago office; that he never went to the inn while the furnace was being installed; that Mr. Arbogast during the time the furnace was being put in place came to the local store at Casper and obtained some asbestos paper, saying that they were short a roll of it and some elbows and needed these to finish the job; that he (Redman) never saw the furnace after it was installed and in operation;

that he himself is not a furnace installer; and that the Casper store of the Company has never employed a furnace installer.

G. L. Welch testified as a witness for the defendants: That he and his son went out to the inn; that "we heard that they had a furnace they wanted installed— some one to install it. We went out to see if we could get the job, and they showed me where they wanted the furnace set. Asked me to give them a price on the labor, which I did, and the furnace was delivered while we were there, and we started installing the next morning"; that the agreed price for doing the work was the sum of $25.00; that the contract was made with both Mr. and Mrs. Arbogast; that he had no connection whatever with the Montgomery Ward Company in connection with the installation of the furnace; that he was paid $12.00 or $12.50 when the job was completed and the balance was paid in two payments after that; that it took two or three days to install the furnace; that when he learned of the furnace job he was out of work; that the Company was not paying him in any way; that he was not sent to the Arbogast Inn by the Company, and he went only to figure the job. The testimony of Clair Welch was substantially the same. He stated also that the job took two days to complete and that they went back the third day to check it; that the Arbogasts accepted the job at the time it was completed and paid the balance due his father and him either two or three weeks afterwards.

D. L. Miller, the Casper store manager of the Company, testified that Redman had only authority to sell furnaces and heating equipment and had no authority to employ men to install the equipment sold; that he (Miller) is required to O. K. all contracts and all additions thereto; that the practice of the Company with reference to installing furnaces directs that it is first necessary "to obtain the permission of our Chicago

office to obtain and keep in our employ anyone to install plumbing or heating, and secondly, it is necessary to obtain from our Chicago office the authority to put in what we call deferred installation, which means that if the customer wishes the amount charged by the plumber or hot air installator, that must be carried on our books, we have to have that permission"; that he talked with Mrs. Arbogast in his office sometime in January or February after the fire and was told by her "that she didn't hold us responsible for the fire and that she would continue to make their payments"; that the method by which installation charges are carried as "on time" payments by the Company is that "there is a special form that we have, that the customer himself signs, to lien his property for the installation charges. There is another form that must be signed by the customer stating that the merchandise, that the installation has been properly taken care of, and these forms are filed with the contract in our files"; that there is contained in that form an acceptance of the work as installed and performed; that he as store manager has the discretion to write to Chicago for authority to install plumbing and furnaces; that he has never written to ask for that authority.

Citing an exhaustive list of cases, 1 Mechem on Agency, Second Edition, Section 285, pages 205-7, says that:

"The authority of an agent, and its nature and extent where these questions are directly involved, can only be established by tracing it to its source in some word or act of the alleged principal. The agent certainly cannot confer authority upon himself or make himself agent merely by saying that he is one. Evidence of his own statements, declarations or admissions, made out of court therefore (as distinguished from his testimony as a witness), is not admissible against his principal for the purpose of establishing, enlarging or renewing his authority; nor can his au-

thority be established by showing that he acted as agent or that he claimed to have the powers which he assumed to exercise."

See also Hatch Bros. Co. v. Black, 25 Wyo. 109, 165 Pac. 518; Raymond v. National Life Insurance Company, 40 Wyo. 1, 273 Pac. 667.

The learned author above cited (1 Mechem on Agency, Second Edition, Sections 334-335, pages 249-250) also says:

"The ordinary agent, employed to do other acts, has usually no authority whatever to bind his principal by the employment of other agents, servants or contractors for him. For obvious reasons, this is a matter which the principal will ordinarily do in person or through an agent appointed for that purpose.

"The ordinary servant, also, has usually no authority to employ other servants, or agents or contractors for his principal. The test of the existence of the relation, as has been seen, is that the servant is not employed to create contractual relations between his master and third persons."

Of similar import is 2 C. J. 685, Section 342, and cases listed.

While authority to an agent to employ others on behalf of his principal may be, as pointed out by Mr. Mechem, expressly given, it may also be implied. In the latter case it is generally to be implied or inferred only when sanctioned by the usages of the particular agency or by the nature and necessities of the business intrusted to the agent or when the principal has by his conduct invested the agent with apparent authority to employ. 2 C. J. 659; 21 R. C. L. 854, Section 33. So the author above cited additionally says as to this kind of authority: "It is not to be created by mere presumption nor by any abstract considerations, however potent, that it would be expedient or proper or convenient that the authority should exist." 1 Mechem

on Agency (2d Ed.) Sec. 708, p. 498; Bickford v. Menier, 107 N. Y. 490, 14 N. E. 438.

As illustrative of implied authority vested in an agent to employ sub-agents in the course of the principal's business, the following cases are instructive:

In Patterson v. Neal, 135 Ala. 477, 33 So. 39, it was held that where there was testimony on the part of several witnesses that a mine boss had employed men to dig coal and assigned them to work, but it was also shown that he had never employed such diggers until after the approval of the superintendent and had, in fact, no actual authority to employ them, there was no evidence to show an implied authority on his part to hire coal miners.

A traveling salesman was held in United States Bedding Company v. Andre, 105 Ark. 111, 150 S. W. 413, to have no implied authority to enter into a contract for advertising his principal's business in a newspaper or upon bill boards, and the court pointed out that, "to authorize an inference of authority in an agent, it must appear that the thing done or transaction made was necessary in order to promote the duty or carry out the purpose expressly delegated to him."

In Pine Bluff Heading Co. v. Bock, 163 Ark. 237, 259 S. W. 408, it was ruled that the mere fact that one was employed to buy heading bolts for his principal did not authorize him to hire other buyers.

The case of Willoughby v. Brown, 190 Ill. App. 51, was one where it was decided that authority to sell the leased property did not imply authority in the agent to employ a broker.

To the same effect is the case of Doggett v. Greene, 254 Ill. 134, 98 N. E. 219.

In Peter Schoenhofen Brewing Co. v. Wengler, 57 Ill. App. 184, it was held that an agent L., who was authorized to find customers and take orders for beer

manufactured by his principal and to collect the bills for the beer that had been sold and delivered, had no authority by implication to fit up saloons wherein the purchasers of the beer should sell it. Under verbal statements made to him by L. that the brewing company would pay for the work, Wengler had fitted up a saloon, and then sued the brewing company for the price thereof. The trial court received evidence of these statements as binding upon the company. Citing Mechem on Agency as above quoted, and other authorities, the court also held this to be error, and a judgment for the plaintiff was reversed.

Benema v. Union Central Life Insurance Company, 94 Mont. 138, 21 Pac. (2d) 69, is a case wherein it was decided that neither the farm superintendent nor the assistant financial correspondent of a life insurance company, which had entered into a contract to sell certain property in their charge, had authority to employ a carpenter at the expense of the company to repair buildings located on the property thus to be sold.

In Mancini v. Stephenson's Associates, Inc., 15 N. J. Misc. 9, 188 Atl. 443, the court held that the agent of a landlord empowered to collect rents had no implied power to make an agreement with a tenant on behalf of the landlord to make necessary repairs in a floor located in a building occupied by the tenant.

It was decided in Stratton v. Todd, 82 Me. 149, 19 Atl. 111, that an agent authorized to sell logs after they had reached a particular location had no implied authority to contract for driving certain of these logs to that location. The court pointed out that to establish an agency by inference it should be shown that the acts "from which authority to do a specified act can be implied must be of the same general character and effect."

The case of Standard Sanitary Mfg. Co. v. Stump, 212 Ky. 253, 278 S. W. 583, holds that a traveling sales-

man for a plumbing supply company had no implied authority to join with a local plumber in making a contract with purchasers that the principal of the salesman would supply plumbing materials and the local plumber would install them where the purchasers knew the character of the salesman's employment. It was emphasized by the court that "those who deal with such agent are bound at their peril to know the extent of his authority."

In Skelly Oil Co. v. Pruitt & McCrory, 94 Okla. 232, 221 Pac. 709, it was held that the employment of a broker by the agent to assist him in the purchase of real estate was not necessary or incidental to the exercise of an express grant of power to purchase real estate, and the court said:

"The agent can only bind the principal when acting within the scope or apparent scope of his authority, and is only authorized to exercise the express or implied powers granted to him by the principal. Howe v. Martin, 23 Okl. 561, 102 Pac. 128, 138 Am. St. Rep. 840. The agent binds the principal when acting within the scope of his authority. The scope of the agent's authority is fixed by the express and implied powers given to him by the principal. The implied powers which the agent may exercise are those powers that are necessary or incidental to carry into effect the express powers granted to him by the principal, and the agent's acts within this scope bind the principal. Dispatch Printing Co. v. Nat. Bank of Commerce, 109 Minn. 440, 124 N. W. 236, 50 L. R. A. (N. S.) 74. * * *

"As the only evidence received by the jury consisted of statements and declarations of the agent, in the absence of his principal, the verdict of the jury rests entirely upon incompetent evidence. There being no competent evidence to support the verdict of the jury, it cannot stand."

See also Faiola v. Carderone, 275 Pa. 303, 119 Atl. 539; James Bradford Co. v. Edward Hill's Son Co., Inc. (Del.) 116 Atl. 353.

Discussing the matter of proof of agency, the court in Kaden v. Moon Motor Car Co. (Mo. App.) 26 S. W. (2d) 812, remarked:

"We appreciate the fact that there is no particular mode by which an agency may be established; that it is immaterial what terms are used by the parties, or by what name the transaction is designated, if the facts, taken as a whole, fairly disclose that the one party is acting for or representing another by the latter's authority; and that the relationship of agency does not depend in every instance upon an express appointment and acceptance, but is often to be implied from the words and conduct of the parties to the transaction. Noren v. American School of Osteopathy (Mo. App.) 2 S. W. (2d) 215, and cases cited. However, it must be borne in mind in this connection that the law indulges no presumption that an agency exists; and that if an agency is to be implied from the facts of a given case, it must be implied from a natural and reasonable, and not from a forced, strained, or distorted construction of those facts."

Applying the principles declared and illustrated by the above cited authorities to the facts in this case as set forth above, we are clearly of the opinion that there was no express authority vested in Redman to agree on behalf of the Company to install the furnace in question. His authority in fact was that he could not agree to do such a thing. We are equally clear that under the evidence reviewed above he had no implied power to agree to install the furnace he sold to the Arbogasts. His express power was concededly simply to sell the merchandise intrusted to his care, and we do not think that an agreement to install it was essential or necessary to carry out the duty assigned him by the Company. It certainly was not as regards the installation of the plumbing fixtures sold to Mr. and Mrs. Arbogast at the same time as the furnace, and they, indeed, must have so regarded the matter for they themselves hired Farrar, the man mentioned by

Redman as one who did that sort of work, and paid him themselves. Why the furnace installation should be regarded in a different light we are quite unable to perceive. The statement of Mr. Arbogast that Redman said, "Sure we install," was incompetent evidence of any authority on Redman's part, and so thought the trial judge in his first ruling on the point, both on first impression and after taking the trouble to hear argument by counsel concerning the question.

Redman's sworn testimony was that he did not make any such agreement and was not authorized to do so. It is significant that the testimony of Mrs. Arbogast is rather far removed from supporting her husband's version of what Redman said on that occasion. Her version of the statement was that Redman said, "Oh, yes, of course I know you want us to install" the furnace. So far as apparent authority is concerned, it was not shown that the store of the Company at Casper had ever at any time installed the furnaces it sold and that this practice was known to the Arbogasts. Indeed, the inference from the record is plainly that the store never had done so.

The Welchs, who did the actual work of installation of the furnace, both testified, as we have seen, that the Company had nothing whatever to do with their employment in the matter. The testimony of the store manager was clear that Redman never had authority to agree to install the furnace and that special authority was never asked for or given to put the installation charge on the contract for the sale of the merchandise which was bought on time payment, and, of course, the installation work was paid for in cash, both as regards the plumbing fixtures and the furnace. Plaintiffs do not point out the competent evidence which fairly leads to the conclusion that implied or apparent authority to employ the Welchs to install was in fact vested in Redman. We see no substantial evidence in

the record from which such an agency on the part of the Welchs to install furnaces and heating equipment in behalf of the Company can be reasonably inferred.

But even if we should be mistaken on the point just reviewed, we are satisfied likewise that the evidence fails to support the verdict also in that it does not show that the Welchs were in fact employed by the Company through Redman or otherwise. True, Arbogast says in his testimony that he did not employ them. This, of course, is negative testimony. But he admits he paid them for their work, just as he did Farrar for his work in installing the plumbing fixtures. It may not be overlooked either that the installation work was performed for the benefit of the Arbogasts. It was done in their own building, which was at all times in their possession and under their control. The Welchs testified that the Arbogasts both employed them and paid them. Arbogast admits that Redman after selling the furnace and plumbing material never came to the inn to supervise or direct the installation work, or any of it, and never saw the furnace after it was installed. It is not reasonable to suppose that if Redman had agreed to install the furnace and had employed the Welchs to do that work, he would have deliberately stayed away from the place where the work was in progress, never giving it his attention, never requesting an acceptance of it on the part of the Arbogasts when it was completed, or that the Arbogasts would have said nothing to Redman about approving the installation work. Although Arbogast testifies he had nothing to do with the installation, yet it is not denied that during the progress of the work he came into the Company's store and obtained needed material therefor. We hardly think it may be reasonably urged that here was a case of a real conflict in the evidence for only the jury to solve.

As said by the Supreme Court of California in the

recent case of Herbert v. Lankershim, 9 Cal. (2d) 409, 71 Pac. (2d) 220:

"This rule, however, does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence. * * *

"There must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reasonably supports the judgment as applied to the peculiar facts of the case."

See also Wilde, State Examiner, v. Amoretti Lodge Co., 47 Wyo. 505, 41 Pac. (2d) 508; Cyr v. Landry, 114 Me. 188, 95 Atl. 883.

In a later case from the jurisdiction last cited the Supreme Judicial Court of Maine, in Hall v. Cumberland County Power & Light Co., 123 Me. 202, 122 Atl. 418, remarked:

"As a general rule a verdict of a jury will not be disturbed by this court where the evidence is conflicting. A conflict of testimony, however, does not arise merely because one witness testifies contrary to another. There must be substantial evidence in support of the verdict, that is, 'evidence that is reasonable and so consistent with the circumstances and probabilities in the case as to raise a fair presumption of its truth when weighed against the opposing evidence. When it is overwhelmed by the opposing evidence, a verdict cannot stand.' Moulton v. Railway Co., 99 Me. 508, 509, 59 Atl. 1023; Smith v. Ins. Co., 85 Me. 348; 27 Atl. 191; McCarthy v. Bangor & Aroostock R. R., 112 Me. 5, 90 Atl. 490, L. R. A. 1915B, 140; Edgerley v. Thompson, 121 Me. 572, 115 Atl. 818."

In our view of the matter the jury's verdict was unsupported by substantial evidence as to the question of

agency of the Welchs to act for the Company in the installation of the furnace.

It is urged on behalf of the Company that there was error in giving the following instruction to the jury:

"You are instructed that if you believe from the preponderance of the evidence that the defendants agreed with the plaintiffs to install the furnace at Goose Egg Inn, then it became and was the duty of the defendants to exercise ordinary care, commensurate with the danger of fire, in so installing said furnace, to minimize the danger of setting fire to the woodwork above the furnace in the ordinary operation of the furnace, and the failure so to do constitutes negligence."

We are obliged to disapprove of this instruction. There was evidence both that there was and that there was not danger in installing the furnace as was done. While there was a substantial conflict in the testimony on this phase of the case, we think the instruction goes somewhat too far in leading the jury to believe that the court considered there was danger in installing the furnace the way it was actually put in place. This was not a question of law for the court, but one of fact to be determined by the jury upon a consideration of all the evidence of both parties relative to the matter. Barber v. Sheridan Trust & Savings Bank (Wyo.) 78 Pac. (2d) 1101.

It is argued that the language of this instruction was made use of in the case of Wright v. Holland Furnace Company, 186 Minn. 265, 243 N. W. 387. An examination of that decision shows that some of the language embodied in the instruction was employed in the opinion and no criticism of it as it appears in its context therein or under the circumstances of that case may reasonably be made. This language does not seem to have been used in any instruction, however, given in the case, which was one involving the violation of a city ordinance concerning furnace installation

and negligence in placing the furnace smoke pipe through which the flame and smoke from the fire in the furnace itself passed too close to unprotected wood joists. The negligence charged in the case at bar was in placing the top of the furnace bonnet too close to the joists above it, failure to protect those joists from fire hazard by installation of proper insulating material and failure to fill the cone in the bonnet with sand. The undisputed testimony was that no flame or smoke passed into the bonnet of the furnace in question here. We are inclined to think that extracting language from an opinion of an appellate court and inserting it in an instruction to a jury, without carefully checking all of the evidence submitted in the case, is not always a satisfactory way of framing an instruction free from error.

It is argued on behalf of the Company that the court erred in overruling plaintiffs' motion for a directed verdict, but this motion was not renewed at the close of the trial. See Campbell v. Weller, 25 Wyo. 65, 164 Pac. 181. It may be remarked, also, that we do not seem to find any exception taken by counsel for the Company in the record concerning the court's ruling in this regard.

Other questions are argued, but their consideration is not necessary to a disposition of the case as submitted. The judgment under review will for the reasons above set forth accordingly be reversed.

*Reversed.*

BLUME, C. J., and KIMBALL, J., concur.